**STATE of Indiana, Appellant
(Plaintiff below),**

v.

**Robert BULINGTON, Appellee
(Defendant below).**

No. 79S04–0310–CR–436.

Supreme Court of Indiana.

Jan. 29, 2004.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

E. Kent Moore, Lafayette, IN, Attorney for Appellee.

SULLIVAN, Justice.

The police asked a Meijer Superstore to report every customer who bought three or more packages of cold medicine. Acting on such a report, the police stopped and searched defendant Robert Bulington's truck and discovered various other substances used to produce methamphetamine. He was charged with the crime of "Possession of Precursors of Methamphetamine." We affirm the trial judge's decision that there was insufficient evidence to create the reasonable suspicion necessary to justify stopping defendant's truck.

## Background

The Lafayette Police Department drug task force asked Daniel Majors, a loss prevention team member at Meijer Superstore in Lafayette, to call every time Meijer loss prevention team members saw a customer select three or more boxes of cold medicine, antihistamines, or Robitussin. The police department also instructed Majors to call when a customer purchased lithium batteries, a can of fuel, duct tape, or any other precursors for the manufacture of methamphetamine. Meijer's employees were instructed to contact the police even if the customer only purchased one roll of duct tape or one can of fuel. Loss prevention team members instructed Cassie Oakley, a Meijer team leader, to watch for people looking at nasal decongestants because the medication can be used in manufacturing illegal drugs.

On December 11, 2001, at approximately 10:00 p.m., Oakley saw two men, including defendant, looking at nasal decongestants. When Oakley asked the men if she could help them, they said no. Oakley told Majors and Jason Linder, another loss prevention team member, to keep an eye on the two men. Majors watched the two using a store camera system. He saw both men each select three boxes of antihistamines and proceed to separate checkout counters. As soon as the first man left with his purchase, Majors contacted the Lafayette Police Department. Majors then observed the men walk out the store separately and go to the same truck. Majors zoomed the camera in on the men and saw that they were removing the tablets from the boxes and putting them in Meijer bags.

Three Lafayette police officers in three separate patrol cars were dispatched to the Meijer store. On the way to the store, a police dispatcher was in contact with Meijer loss prevention concerning the two

men, their location and movements, and the color and type of vehicle they were driving. When the officers arrived at Meijer, the men were pulling out of the parking lot. Officer Anthony Scott McCoy stopped the truck in a parking lot located down the road from Meijer. Officer McCoy asked defendant for consent to search the truck, and defendant gave consent. Officer McCoy and Officer Cheever searched the truck and found a Meijer shopping bag containing six empty Meijer ephedrine packages, an Osco bag containing hundreds of loose ephedrine pills, and approximately six unopened foil packs with pills inside them. Officer McCoy also found a bag from a Super Target store containing starting fluid (which contained ether) and STP Gas Treatment, receipts showing other purchases for cold medicine, a plastic tube that had some tape at the end, a piece of aluminum foil that had charring at the bottom and black and white residue, and two four-packs of lithium batteries. Based on his training and experience, Officer McCoy believed that these items were to be used to manufacture methamphetamine.

The State charged defendant with Conspiracy to Commit Dealing in Methamphetamine, "Illegal Drug Lab," Maintaining a Common Nuisance, and Reckless Possession of Paraphernalia. Defendant filed a motion to suppress the items the police found in his truck and his statement. After holding a hearing, the trial court granted defendant's motion holding that the "traffic" stop was defective under the totality of the circumstances under both the United States Constitution and the Indiana Constitution since the investigatory stop was based solely on a tip made by a cooperative citizen based upon a profile (purchase of three boxes of cold medicine) and there was no crime or traffic violation committed in the officer's presence. The court also found that the State failed to meet its burden of establishing that the consent to search the vehicle was made voluntarily.

The State appealed the trial court's ruling to the Indiana Court of Appeals. A majority of the panel reversed the trial court and held that under the totality of these circumstances, the information was sufficiently reliable to provide the officer with reasonable suspicion that defendant and his companion possessed, or were about to possess, two or more chemical reagents or precursors with the intent to manufacture methamphetamine. *State v. Bulington,* 783 N.E.2d 338 (Ind.Ct.App. 2003). Furthermore, the court found that defendant's consent to search his truck was freely and voluntarily given, thus the search was valid under the Fourth Amendment of the United States Constitution and reasonable under Article I, Section 11, of the Indiana Constitution. *Id.* at 351. Judge Darden dissented. *Id.* at 351. We granted transfer. 2003 WL 310486, 2003 Ind. LEXIS 818 (Ind. Oct. 2, 2003).

### Discussion

The State contends that the trial court erroneously granted defendant's motion to suppress the evidence the police found in defendant's truck. The State argues that the officers had reasonable suspicion to believe that criminal activity was afoot when they stopped defendant because Meijer store employees observed defendant and his companion with six boxes of ephedrine, a precursor for methamphetamine. Defendant responds that the officers conducted an investigatory stop without reasonable suspicion in violation of the Fourth Amendment of the United States Constitution and art. I, § 11, of the Indiana Constitution.

The Court of Appeals found the police stop of defendant's vehicle passed muster under both the United States and Indiana

Constitutions. As to the federal claim, we find the issue fairly debatable. The United States Supreme Court's most recent opinion in this regard has emphasized that "reviewing courts should make reasonable-suspicion determinations by look[ing] at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (*quoting United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). *Arvizu* also stressed that federal appellate courts review trial court determinations of reasonable suspicion de novo rather than for "abuse of discretion." 534 U.S. at 273–274, 122 S.Ct. 744 (*citing Ornelas v. United States*, 517 U.S. 690, 691, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Applying de novo review here,[1] it may be that the Fourth Amendment's mandate of reasonable suspicion is achieved. Because we find defendant clearly entitled to relief as a matter of state constitutional law, we need not resolve his federal claim.

 Although art. I, § 11, of the Indiana Constitution appears to have been derived from the Fourth Amendment and shares the same language, we interpret and apply art. I, § 11, independently from Fourth Amendment jurisprudence. *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002); *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind.2001); *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind.1999); *Brown v. State*, 653 N.E.2d 77, 78 (Ind.1995); *Moran v. State*, 644 N.E.2d 536, 540 (Ind.1994). Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims,

we place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. *Baldwin*, 715 N.E.2d at 337, (*citing Brown*, 653 N.E.2d at 79–80).

A determination of whether there was reasonable suspicion in this case does not turn on the reliability of the informant's tip. *Cf. State v. Glass*, 769 N.E.2d 639 (Ind.Ct.App.2002) (anonymous tip did not provide reasonable suspicion under Fourth Amendment for traffic stop), *trans. denied* 783 N.E.2d 695 (Ind.2002). It is uncontested that the police department had a previous relationship with the Meijer's loss prevention personnel, and that members of that department contacted the police and provided sufficient detail of the conduct engaged in by defendant and his companion. The question that this case poses is whether the content of the information contained in that tip was enough to provide Officer McCoy with reasonable suspicion.

We have applied this general principle of reasonable suspicion in three major cases that have some bearing on the question presented here.

In *Mitchell v. State*, we were asked to consider whether "pretextual" traffic stops—police stops for a minor traffic violations as a pretext to investigate drivers or vehicles for other reasons—were reasonable within the meaning of art. I, § 11. We held such stops constitutional for two reasons:

We find nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity by the motorist, to nevertheless re-

---

1. *Ornelas* says that de novo appellate review of reasonable suspicion determinations must "give due weight to inferences drawn from [the] facts by resident judges...." *Ornelas*, 517 U.S. at 699, 116 S.Ct. 1657. Justice

Scalia has argued that such deference is incompatible with de novo review. *Arvizu*, 122 S.Ct. at 754, 122 S.Ct. 744 (Scalia, J., concurring) (*citing Ornelas*, 517 U.S. at 705, 116 S.Ct. 1657 (Scalia, J., dissenting)).

spond to an observed traffic violation. It is likewise not unreasonable for a motorist who commits a traffic law violation to be subject to accountability for said violation even if the officer may have an ulterior motive of furthering an unrelated criminal investigation.

745 N.E.2d at 787.

In *Baldwin v. Reagan,* we were asked to consider whether traffic stops to determine whether seat belts were fastened were reasonable within the meaning of art. I, § 11. We held that a police officer could not stop a motorist in Indiana for a possible seat belt violation "unless that officer reasonably suspect[ed] that the driver or· a passenger in the vehicle [was] not wearing a seat belt as required by law. This reasonable suspicion exists where the officer observes the driver or passenger under circumstances (e.g., bodily movement, distance, angle, lighting, weather) that would cause an ordinary prudent person to believe that the driver or passenger is not wearing a seat belt as required by law." 715 N.E.2d at 337.

In *State v. Gerschoffer,* we were asked to consider whether traffic stops at sobriety checkpoints were reasonable within the meaning of art. I, § 11. While acknowledging the absence of the individualized suspicion of which we spoke in *Baldwin,* we identified as the principal value embodied in art. I, § 11, protection of "Hoosiers from unreasonable police activity in private areas of their lives." *Gerschoffer,* 763 N.E.2d at 965 (*citing Brown,* 653 N.E.2d at 79). Drawing from some work by Professor Amar, we concluded that that value was promoted by reducing "official arbitrariness, discretion, and discrimination." *Gerschoffer,* 763 N.E.2d at 966 (quoting Akhil Reed Amar, *Fourth Amendment First Principles,* 107 Harv. L.Rev. 757, 809

(1994)). We then looked to the public safety benefits of sobriety checkpoints in reducing alcohol-related automobile accidents and found they could be achieved consistent with art. I, § 11, with "minimally intrusive roadblock[s] designed and implemented on neutral criteria that safely and effectively target[ ] a serious danger specific to vehicular operation." *Gerschoffer,* 763 N.E.2d at 966.[2]

■ Reading *Mitchell, Baldwin,* and *Gerschoffer* together, our art. I, § 11, jurisprudence does not limit the authority of law enforcement in circumstances where an ordinarily prudent person would believe a violation of law has occurred or is occurring. But where there is no reason to believe a violation of law has occurred or is occurring, a traffic stop is reasonable only if designed and implemented on neutral criteria that safely and effectively targets a serious danger specific to vehicular operation.

Defendant's case is not on all fours with any of these precedents.

On the one hand, the police had absolutely no reason to believe defendant had violated or was violating any law when he was stopped. While it is a crime to possess two or more "chemical reagents or precursors" with the intent to manufacture methamphetamine, Ind.Code § 35–48–4–14.5(c), the evidence is not disputed that the defendant and his companion only purchased one such reagent or precursor at Meijer, ephedrine. And the trial court specifically found that defendant had not committed any traffic violation.

On the other hand, defendant was not stopped at random. There was at least some reason to believe that, to use a phrase borrowed from federal jurispru-

---

2. Importantly, we did find in *Gerschoffer* that, while roadblocks do not per se violate art. I, § 11, the roadblock at issue in that case was unconstitutional.

dence, "criminal activity might be afoot"— defendant and his companion had together purchased a quantity of one "reagent or precursor."

Was this enough to establish reasonable suspicion for purposes of art. I, § 11? We hold that it was not.

■ If the principal value of art. I, § 11, is to "protect Hoosiers from unreasonable police activity in private areas of their lives," *Brown*, 653 N.E.2d at 79, then the standards for its application must, in Professor Amar's words, "reduce[ ] the opportunities for official arbitrariness, discretion, and discrimination." Amar, 107 Harv. L.Rev. at 809. The opportunities for official arbitrariness, discretion, and discrimination are simply too great if we were to find that the purchase by two companions of three packages each of cold medicine[3] justifies a search or seizure under art. I, § 11. Such a holding, at least in an Indiana winter, would permit so many searches and seizures as to license official arbitrariness, discretion, and discrimination in their execution. And the problem is compounded when the nature of other "reagents and precursors" are considered—substances such as rubbing alcohol, iodine, duct tape, lithium batteries, and antifreeze.

Just as we were forced in *Gerschoffer* to confront "tension between multiple constitutional objectives" in respect of alcohol-related traffic accidents, this case brings us face to face with the serious dangers of methamphetamines. Indeed, a major publication has recently written about the methamphetamine "menace" in Indiana and other Midwestern states and the danger it poses "to the lives of children who suffer from the drug—from the noxious fumes its manufacturers produce, from the risk of fire and explosions, and from abuse or neglect by adults on a long, cheap high." *You take the high road,* The Economist, Nov. 29, 2003 (U.S.Edition).

A brief review of cases from other jurisdictions indicate that had additional indicia that "criminal activity was ·afoot" been available to the police here, the traffic stop at issue might well have been valid.

In *State of Iowa v. Heuser*, 661 N.W.2d 157 (Iowa 2003), a Target store employee notified police that two people had purchased numerous packages of over-the-counter cold medication containing pseudoephedrine hydrochloride. The couple entered the store together but separated and bought the medicine at different cash registers. The employee gave the police a description of the man and woman, the van they were driving, and the license plate number. The police found the van at Wal-Mart where they saw the woman go into Wal-Mart and come out with her purchases. The couple then drove to Walgreens. The man went into the store. The police contacted the store and asked what the man bought. The employee saw the man purchase several boxes of cold medication containing pseudoephedrine hydrochloride and ask about lithium batteries. At each stop, the man and woman traded places driving the van, so as to alternate the person purchasing the medication. The police stopped the van a short time latter. The Iowa Supreme Court found that the officers had reasonable cause under the Fourth Amendment to stop the van. *Id.* at 162. We likely would have reached the same result under art. I, § 11. As the Iowa court said:

> This is not a case where a person possessed only a large amount of cold

---

**3.** Retail stores often offer, "buy one-get one free" coupons with a one-per-customer limitation. A customer can circumvent that limitation and double his or her purchasing power by shopping with a companion, each of whom uses the "buy one-get one free coupon," checks out separately, and then meets outside to settle up.

medication *or* only a number of lithium batteries. Rather, Heuser possessed an unusually large number of pills. In addition to the pills, the officers had reasonable cause to suspect Heuser also possessed lithium batteries. These facts coupled with Heuser's suspicious conduct driving from store to store gathering medication and switching-off with his companion to buy the pills formed a solid basis upon which the officers had reasonable cause to stop the van to determine whether "criminal activity [was] afoot."

*Id.* at 161 (emphasis included in original opinion).

*Heuser* is representative of the recent cases concerning this subject. Courts have found reasonable suspicion under the Fourth Amendment when the customer (1) purchases a combination of methamphet-amine precursors from one store; [4] (2) purchases a combination of precursors from several stores; [5] (3) purchases of one precursor and then commits a traffic violation warranting a traffic stop; [6] and (4) purchases one precursor and the arresting officer has knowledge of defendant's previous involvement with methamphetamine. [7]

Like *Heuser,* we think it likely that we would find reasonable suspicion to exist in each of these circumstances. But none of these cases involved an officer conducting an investigatory stop of a person based solely on information that the person legally purchased a small to moderate amount of one precursor. Rather, in *Heuser* and each of the cases cited in footnotes 4, 5, 6, and 7, the respective courts relied on *at least one other additional specific and articulable circumstance* that, when combined with the purchase of one precursor, produced evidence sufficient to create an

4. *State v. Odom,* 2003 Ala.Crim.App. LEXIS 160, * 6, 2003 WL 21480583 (Al. Ct.App. June 27, 2003) (officer noticed the individuals go through the checkout line "several" times to purchase 2 bottles of propane fuel, a set of stainless steel cookware, 4 packages of lithium batteries, 3 boxes of Equate brand cold and allergy medication, 4 boxes of Sudafed cold and allergy medication, and 12 bottles of antifreeze). *See State v. Maddox,* 670 N.W.2d 168, 173–174 (Iowa 2003) (finding probable cause where officers knew that the defendant had purchased a six-pack of starter fluid, flexible plastic tubing, coffee filters and a plastic or glass jar in one of their carts, items which the manager recognized in combination might be used to produce methamphetamine).

5. *United States v. Ameling,* 328 F.3d 443, 448 (8th Cir.2003) (officers knew that a Target security officer with special training on methamphetamine manufacturing observed the defendants enter the store together, split up and go through separate registers to purchase a significant amount of pseudoephedrine; defendants reunited at a truck outside the store; defendants immediately traveled to a nearby store to make further purchases; and an employee at that store informed the officers that the defendant's purchased a lithium battery) *cert. denied* —— U.S. ——, 124 S.Ct. 422, 157 L.Ed.2d 301, 2003 U.S. LEXIS 7648 (2003).

6. *State v. Vereb,* 643 N.W.2d 342, 347 (Minn. Ct.App.2002) (officer received a report from a store employee who observed two men purchasing a large number of cold tablets; the chief knew that cold tablets were precursor materials use in the production of methamphetamine; the employee indicated to the officer that the men had recently left the store in a vehicle; the employee accompanied the officer in a search for the vehicle; the drivers of the vehicle attempted to evade his pursuit by traveling at excessive speeds).

7. *United States v. Townsend,* 330 F.3d 438, 441 (6th Cir.2003) (officer knew that defendant purchased a large quantity of ingredients known to be used in the manufacture of methamphetamine; the color, model, and tag number of defendant's vehicle, as well as the direction in which it was traveling; that the car had recently been involved in a chase relating to the theft of anhydrous ammonia; and that defendant had been involved in an explosion at an alleged methamphetamine lab).

inference that the defendant's intention in engaging in the combination of activities was to possess chemical reagents or precursors for the manufacturing of methamphetamine.

### Conclusion

Having previously granted transfer pursuant to Ind.App. R. 58(A), we now affirm the judgment of the trial court.

DICKSON and RUCKER, JJ., concur.

BOEHM, J., dissents with separate opinion in which SHEPARD, C.J., joins.

BOEHM, J., dissenting.

As the majority notes, we review these reasonable suspicion determinations de novo. Under that standard, I have no trouble finding that the information supplied by the Meijer store employees provided the officers with grounds for reasonable suspicion that a crime was afoot. The police were told that two men lingered in front of the cold remedy section of the store where one finds products containing ephedrine, a widely known ingredient of methamphetamine. Each selected the maximum number of packages that the store is to sell to one customer without notifying law enforcement. The two then separated and checked out individually. They are then observed emptying the pills into bags of loose pills. Of common human activities of which I am aware, I can think of nothing these actions suggest except preparation to cook these pills into some broth. It seems to me that the police had a moral certainty, not just reasonable suspicion, that they had some unregulated pharmaceutical manufacturers on their hands. I would reverse and remand for trial.

SHEPARD, C.J., joins.