**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 23 2015, 10:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK LEEMAN**
Cass County Conflict Public Defender
Leeman Law Offices
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**ABIGAIL R. MILLER**
Graduate Law Clerk
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| V.B., P.B. & B.B., (Minor Children), | ) |
| CHILDREN ALLEGED TO BE CHINS | ) |
| | ) |
| And | ) |
| | ) |
| A.B., (Mother) | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )     No. 09A02-1407-JC-518 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD | ) |
| SERVICES, | ) |
| | ) |
| Appellee-Petitioner. | ) |

**January 23, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

Case Summary and Issues

A.B. ("Mother") appeals from the juvenile court's determination that her three children are children in need of services ("CHINS"). She raises two issues for our review: 1) whether the evidence was sufficient to show that her children are CHINS, and 2) whether the juvenile court abused its discretion in admitting an Indiana Department of Child Services ("DCS") exhibit into evidence. Concluding the testimony at the fact-finding hearing was sufficient to show that Mother's children were CHINS and that any error in the admission of the challenged exhibit was harmless, we affirm.

Facts and Procedural History

Mother has three minor children (collectively, "the Children"), and in the early part of 2014, she was renting an apartment on Heath Street in Logansport, Indiana. The

Children's uncle, Samuel Gentry, also lived at that address. Mother's boyfriend, Robert Dowell, lived on West Wabash Street in Logansport.

On February 18, 2014, Mother dropped off the Children at a babysitter's house between 10:00 a.m. and 11:00 a.m. and did not pick the Children up until about 9:30 p.m. that night. Mother then dropped the Children off at the Heath Street apartment with Gentry between 9:30 p.m. and 10:30 p.m.

On the same evening, an officer from the Logansport Police Department received a complaint alleging that there was drug activity with children present at Dowell's address on West Wabash Street. Several officers responded to the call, arriving at the home around 10:30 p.m. When Dowell answered their knock, they could smell a chemical odor they associated with the manufacture of methamphetamine coming from within. The officers received permission to search the home for children. No children were present; however, because the officers continued to smell the chemical odor, they detained both Mother and Dowell and obtained a search warrant to search the home for drug activity.

One of the rooms in the home was blue and gray and contained articles of children's clothing, Disney movies, diapers, and toys. It "appeared that children had been in there." Transcript at 71. An adjacent room had been converted into a tattoo parlor and contained an active methamphetamine laboratory, including drug paraphernalia and items used to manufacture methamphetamine. Mother and Dowell were arrested.

Mother told the officers that the Children were at the Heath Street apartment with Gentry, and one of the officers went there to locate the Children. Because Gentry had active warrants for his arrest, the officer obtained a search warrant before entering the

3

home. Upon entry, the officer saw three children sleeping in the living room. The floors of the apartment were covered with trash, dirty diapers, empty alcohol bottles, and cat feces. There was a lighter and a bottle of kitchen cleaner on the stove, and the refrigerator contained no edible food and spoiled milk. Gentry was arrested on the outstanding warrants and DCS was called. The Children were eventually taken to the hospital where they tested negative for alcohol and methamphetamine exposure.

The DCS employee who conducted the preliminary inquiry on February 18-19 spoke with Mother, who admitted she and the Children had stayed at Dowell's home previously but denied the Children were there on February 18. Several weeks later, however, Mother told a consultant during a supervised visit with the Children that the Children had been eating candy bars at Dowell's home in the morning on the day she was arrested. The DCS intake officer also spoke with Mother's oldest child, who stated her family had moved in with Dowell and that she and her siblings had a blue and gray bedroom there. Based upon this information, DCS asserted in a request for the juvenile court to authorize the filing of CHINS petitions that the environment in which the Children were found was below the minimum sufficient level of care and that there was reason to believe the Children had been in a home where methamphetamine was manufactured. The juvenile court authorized the filing of the CHINS petitions. Following an initial hearing on February 20, the Children were placed into foster care, and Mother was referred to Lifeline Youth and Family Services ("Lifeline"), where she began participating in supervised visits and case management services.

4

On June 25, 2014, the juvenile court held a fact-finding hearing at which the testimony was consistent with the above recitation of facts. In addition, Gentry testified that he had been staying at the Heath Street apartment for approximately two months prior to the Children's removal and that Mother and the Children only stayed there "every now and then." Tr. at 100. As far as he knew, Mother and the Children were living at Dowell's home, and they had not been at the Heath Street apartment on the morning of February 18. Also, one of the DCS family case managers testified that Mother had acquired suitable housing and had tested negative on every drug screen. However, because Mother was living with Dowell and intended to continue her relationship with him, DCS required Dowell to participate in services. DCS believed he could be a threat to the Children's safety if they were returned to Mother's home. Dowell had not participated in any services and was incarcerated on drug-related charges at the time of the hearing.

The juvenile court admitted several items of documentary evidence offered by DCS during the fact-finding hearing, including, over Mother's hearsay objection, Exhibit 2, an assessment of the alleged child abuse or neglect. Ultimately, the juvenile court found that the Children were CHINS and concluded that removal from the home was in the best interest of the Children because of Mother's "inability to provide shelter, care, and/or supervision at the present time[,]" and because "the children need protection." Appellant's Appendix at 107.

The juvenile court issued a dispositional order on July 17, 2014, outlining a Parent Participation Plan and awarding wardship of the Children to DCS. Mother now appeals the juvenile court's CHINS adjudication.

5

I. Sufficiency of the Evidence

A. Standard of Review

"Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that [the Children are] CHINS as defined by the juvenile code." In re N.E., 919 N.E.2d 102, 105 (Ind. 2010); Ind. Code § 31-34-12-3. To do this, the State must prove that:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> (2) the child needs care, treatment, or rehabilitation that:
>     (A) the child is not receiving; and
>     (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Indiana Code § 31-34-1-1. "[A] CHINS adjudication under [this statute] requires three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." In re S.D., 2 N.E.3d 1283, 1287 (Ind. 2014).

The juvenile court entered findings of fact and conclusions. When a trial court enters findings of fact and conclusions of law, we will not set either aside unless they are clearly erroneous. Ind. Trial Rule 52(A). In making that determination, we will consider whether the evidence supports the factual findings and whether the findings support the judgment. In re L.P., 6 N.E.3d 1019, 1020 (Ind. Ct. App. 2014). "Findings are clearly erroneous when the record contains no facts to support them directly or by inference[,]"

6

and the "judgment is clearly erroneous if it relies upon an incorrect legal standard." Id. In conducting our review, "we consider only the evidence most favorable to the judgment and the reasonable inferences flowing therefrom." In re M.W., 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). We will neither reweigh the evidence nor judge the credibility of the witnesses. In re S.W., 920 N.E.2d 783, 787 (Ind. Ct. App. 2010). "While we defer substantially to findings of fact, we do not do so as to conclusions of law." In re L.P., 6 N.E.3d at 1020.

## B. Evidence Supporting CHINS Adjudication

Mother contends there was not sufficient evidence to show the Children were CHINS because the Children were not present at the West Wabash home at the time the active methamphetamine laboratory was found. Mother's argument primarily relies on Perrine v. Marion Cnty. Office of Child Servs., 866 N.E.2d 269 (Ind. Ct. App. 2007), where this court held that the mother's one time use of methamphetamine outside the presence of her child was insufficient to support a CHINS determination because such a scenario did not seriously endanger the child. Id. at 276. Analogizing the facts in Perrine to the facts of the present case, Mother argues that her one time presence at the scene of an active methamphetamine lab outside the presence of the Children is not sufficient to support the court's CHINS determination.

At the fact-finding hearing, one of the police officers who responded to the February 18 call testified that although no children were found at the West Wabash Street home, it appeared from the contents of the room adjacent to the methamphetamine lab that children had been in there. Although Mother paid rent at the Heath Street apartment, Gentry

7

testified that Mother only stayed there on occasion; rather, Mother had been staying at Dowell's house and as far as he knew, the Children were living there with her. The Lifeline family consultant testified that Mother disclosed during one of Mother's supervised visits that the Children had been at Dowell's house the morning of the day the officers found the active methamphetamine lab but then immediately asked her not to tell "because she told everyone else that the kids weren't at the house." Tr. at 119. Based on the evidence presented at the hearing, the juvenile court found, in relevant part, that:

- Through the testimony of Officer Dillon of the Logansport Police Department an active methamphetamine lab was located at . . . west [sic] Wabash Ave in Logansport, IN where the Mother, [A.B.] was located and arrested. The officer did not locate the above three children at that address. Officers were given information from Mother, [A.B.] that her three children were at . . . Heath Street . . . in Logansport, IN with a babysitter, Samuel Gentry.
***
- Through the testimony of Samuel Gentry he was the only person living at the . . . Heath Street . . . address as the Mother, [A.B.] and her three children were residing at the home of her boyfriend, Robert Dowell.
- Through the testimony of Lifeline case worker, . . . the Mother admitted to her during a visit with her three children that the children were at the home of Robert Dowell on the day the children were removed from her care by the Department of Child Services. . . .
- Through the testimony of Family Case Manager, . . . the Mother, [A.B.] has stated that she is continuing her relationship with her boyfriend Robert Dowell despite the safety concerns of DCS about him being around the children. . . .

Appellant's Appendix at 106. The testimonial evidence, alone, supports these findings.

By relying on Perrine, Mother essentially argues that the evidence was insufficient to show that her actions or inactions seriously endangered the Children. However, unlike the mother's single use of methamphetamine away from the children in Perrine, in the present case, Mother had the Children in the very same home as an active

8

methamphetamine lab within hours of its discovery, something that is inherently dangerous. See State v. Bulington, 802 N.E.2d 435, 440 (Ind. 2004) (noting that the noxious fumes and the risk of fire and explosions caused by the manufacture of methamphetamine poses danger to the lives of children). Neither the fact that the Children tested negative for methamphetamine exposure nor the Children's absence from the home at the time of arrest ameliorates that danger if they were regularly living in the home.

A CHINS finding should consider the family's condition at the time the case is filed and also at the time it is heard. In re S.D., 2 N.E.3d at 1290. "[T]he purpose of a CHINS adjudication is to protect children, not punish parents," and in making its decision, the trial court will look to the best interests of the child. In re N.E., 919 N.E.2d at 106. Although testimony at the fact-finding hearing showed that Mother made progress in providing the care and protection the Children need by passing several random drug screens, finding a job, finding an apartment, and participating in Lifeline services since the petitions were filed, the testimony also showed that the Children would again be placed in danger if they were returned to Mother.

The DCS case manager testified that she had met with Mother and Dowell and informed them that Dowell needed to participate in services—including substance abuse evaluation and treatment—if the Children were to be returned to Mother while she and Dowell continued their relationship. DCS wanted to make sure it was safe for the Children to be around Dowell, as he had used methamphetamine. Although Dowell was living in Mother's new apartment when the DCS case manager performed an assessment in May of 2014, Dowell had not participated in the required services. Moreover, even after Dowell

9

was arrested shortly after the assessment on drug-related charges, Mother indicated to DCS that she wanted to continue the relationship because she "feels that she can help him process through his addiction . . . ." Tr. at 137. The juvenile court therefore concluded that the Children would again be exposed to a dangerous environment.

The State need only prove by a preponderance of the evidence that the Children are endangered and in need of care they can only receive by judicial intervention. Although the evidence linking the Children's presence to the West Wabash home on the day an active methamphetamine lab was discovered is circumstantial, there is sufficient evidence to make that inference and it demonstrates poor decision-making on Mother's part. Moreover, Mother's insistence on continuing her relationship with Dowell despite her acknowledgement that he has addiction issues coupled with Dowell's refusal to participate in services to assure that the Children will be safe in his presence demonstrates that judicial intervention is needed. Accordingly, sufficient evidence exists to support the juvenile court's findings and judgment that the Children are CHINS.

## II. Admission of Evidence

Mother also argues that the juvenile court abused its discretion by admitting DCS Exhibit 2, an assessment of alleged child abuse or neglect, because it was inadmissible hearsay. She further argues that its admission was not harmless error.

"The admission of evidence is entrusted to the sound discretion of the trial court," and that discretion is abused when the court's decision is against the logic and effect of the facts and circumstances. In re A.J., 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), trans. denied. "The fact that evidence was erroneously admitted does not automatically require

10

reversal, and we will reverse only if we conclude the admission affected a party's substantial rights." Id. "In general, the admission of evidence that is merely cumulative of other evidence amounts to harmless error . . . ." In re Paternity of H.R.M., 864 N.E.2d 442, 450 (Ind. Ct. App. 2007).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. See Ind. Evidence Rule 801. Hearsay is inadmissible unless it falls under an exception provided either by law or the rules of evidence. Ind. Evidence Rule 802. Over Mother's hearsay objection, the juvenile court admitted DCS Exhibit 2, a report written by one of the DCS case managers which summarized several events and conversations that transpired out-of-court between February 19, 2014 and March 26, 2014. Although the case manager who wrote the report was unavailable to testify at the hearing and her signature was missing from the document, the juvenile court admitted Exhibit 2 under the business record exception to the rule against hearsay. See Ind. Evidence Rule 803(6) (hearsay will not be excluded if it is a record of a regularly conducted activity).

Mother argues that Exhibit 2 did not fall under the business record exception, and therefore it was inadmissible. Mother further argues that the out-of-court statements included in the report were also hearsay, and therefore, even if Exhibit 2 fell under the business record exception, the statements within it constituted inadmissible hearsay within hearsay.

In addition to being an out-of-court statement itself, Exhibit 2 contained out-of-court statements by one of the Logansport Police officers, the doctor who examined the Children at the hospital, one of Mother's children, the Children's father, Dowell, Gentry, and the

11

person who reported the incident on the night of February 18, 2014. However, we need not address whether Exhibit 2 or the statements contained within it were properly admitted. Our review shows that much of the information conveyed in these statements was also conveyed through testimony at the hearing, and to that extent, it was cumulative. See Cole v. State, 970 N.E.2d 779, 784 (Ind. Ct. App. 2012) (holding that evidence was cumulative where hearsay conveyed the same information as properly admitted testimony at trial). When cumulative hearsay evidence is admitted, reversal is not usually warranted. See In re Paternity of H.R.M., 864 N.E.2d at 450. Although some of the information conveyed in the statements within Exhibit 2 was not properly admitted elsewhere at trial and cannot be said to be cumulative, both the juvenile court's findings and its judgment were supported by the testimonial evidence at trial, alone. Therefore, Mother's substantial rights were not affected, and any error in the admission of Exhibit 2 or the out-of-court statements within it was harmless. See Camm v. State, 908 N.E.2d 215, 225 (Ind. 2009) ("Harmless error is error that does not affect the substantial rights of a party . . . .") (citation omitted).

### Conclusion

Concluding that the testimonial evidence presented at the fact-finding hearing was sufficient to support the CHINS adjudication and that any error in the admission of Exhibit 2 was harmless, we affirm.

Affirmed.

BAILEY, J., and BROWN, J., concur.

12