ROBB, Judge.
Case Summary and Issue
[1] Lisa Harris appeals the trial court’s denial of her motion to suppress evidence obtained from a consent search during a seat belt enforcement stop. Concluding the officer lacked an independent basis of *1071 reasonable suspicion justifying inquiry above and beyond the seat belt violation, we reverse the trial court’s order and remand for further proceedings.
Facts and Procedural History
[2] On November 25, 2014, Indiana State Police Trooper Mike Organ was parked outside a gas station in Clinton, Indiana, when he observed the driver and passenger of a passing vehicle were not wearing seat belts. Trooper Organ pulled out of the parking lot, and the vehicle abruptly turned onto an adjacent street. Trooper Organ, followed the vehicle, activated his emergency lights, and initiated a traffic stop. Trooper Organ approached the driver’s side and first asked the driver for identification. The driver produced her driver’s license, which indicated her name was Lisa Harris. Trooper Organ immediately recognized her name as appearing on National Precursor Log Exchange (NPLEx) reports “in the' past.” Transcript at 7.[1] Trooper Organ then asked Harris “where she was going, and where she was coming from.” Id. at 8. Harris stated she was going to a gas station. When Trooper Organ pointed out she had just passed a gas station and turned onto a street with no gas stations, Harris revised her answer, stating she was actually on her way to apply for food stamps. When Trooper Organ again pointed out Harris was traveling away from her purported destination, Harris’s passenger stated they saw Trooper Organ pull out of the parking lot and turned in order to avoid him. Trooper Organ noticed Harris appeared “overly excited” during this brief exchange, so he asked “if there was anything inside of the vehicle that [he] needed to know about[.]” Id. at 8-9. Harris stated, “absolutely not.” Id. at 9.
[3] Trooper Organ returned to his police vehicle to check Harris’s driving status, determine whether she had any outstanding warrants, and confirm Harris’s name appeared on NPLEx. Harris had a valid driver’s license and did not have any outstanding warrants, but NPLEx indicated Harris had purchased pseudoephedrine nine times in the past year.[2] Her most recent purchase occurred four.days prior to the traffic stop. With this information, Trooper Organ returned to Harris and asked her to speak with him in his police vehicle. Harris agreed. When Trooper Organ asked Harris if she purchased cold medicine containing pseudoephedrine on November 21, 2014, Harris admitted she had, “for her nose.” Id. at 12. He then asked where the pills were. Harris stated the phis were at her house, but when Trooper Organ asked if she could provide proof of this, Harris admitted the pills were no longer in her possession because she sold them for $20.
[4] Trooper Organ obtained Harris’s consent to search her vehicle and its contents. Inside Harris’s purse, he discovered a baggie of white powder that field-tested positive for methamphetamine. Harris claimed she forgot about the methamphetamine and admitted'shé regularly smokes methamphetamine. Trooper Organ cited both Harris and her passenger for failure to wear a seat belt but arrested only Harris. The' State charged Harris with possession of methamphetamine as a Level 6 felony. Harris filed a motion to suppress, which. the trial court denied. The trial court certified the order for interlocutory appeal, and we accepted juris *1072 diction pursuant to Indiana Appellate Rule 14(B).
.Discussion and Decision
I. Standard of Review
[5] We review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of evidence. Sanders v. State, 989 N.E.2d 332, 334 (Ind.2013). We do not reweigh the evidence. Id. We consider conflicting evidence most favorable to the trial court's ruling, as well as undisputed evidence favorable to the defendant. Robinson v. State, 5 N.E.3d 362, 366 (Ind.2014). “We defer to a trial court’s determination of historical fact, but we review de novo whether those facts constitute reasonable suspicion.” Johnson v. State; 21 N.E.3d 841, 844 (Ind.Ct.App.2014), trans. denied. “The record must disclose substantial evidence of probative value that supports the trial court’s decision.” State v. Quirk, 842 N.E.2d 334, 340 (Ind.2006).
II. Motion to.Suppress
[6] Harris contends the trial court erred in denying her motion to suppress because Trooper Organ’s investigation above and beyond the seat belt violation contravened Indiana’s. Seatbelt Enforcement Act (“Act”). We agree. Although a vehicle may be stopped to determine compliance with the Act, “a vehicle, the contents of a vehicle, the driver of a vehicle, or a passenger in a vehicle may not be inspected, searched, or detained solely because of a violation of [the Act].” Ind. Code § 9-19-10-3.1(a) (emphasis added). “[T]he Act simply does not permit investigatory behavior based solely on a seat belt violation unless circumstances arise after the stop that independently provide the officer with reasonable suspicion of other crimes.” State v. Richardson, 927 N.E.2d 379, 383 (Ind.2010).
[7] In Richardson, a police officer initiated a traffic stop based solely on her observation of the defendant driving unrestrained by a seat belt. The officer immediately recognized Richardson from a prior traffic stop and recalled no violence or resistance during that encounter. Richardson was cooperative and readily admitted the seat belt violation, but the officer noticed “a very large, unusual bulge” in Richardson’s pocket. Id. at 381. When the officer asked Richardson what was in his pocket, Richardson said he was carrying a handgun. The officer requested Richardson’s gun permit and ran a criminal background check, which revealed Richardson had a prior conviction for possession of cocaine as a Class D felony. The officer arrested Richardson for possession of a firearm with a prior felony conviction within the past fifteen years. Another officer searched Richardson incident to that arrest and discovered cocaine on his person. The State charged Richardson with dealing in cocaine, among other charges. Prior to trial, Richardson filed a motion to suppress the cocaine. The trial court granted the motion, and the State appealed. Our supreme court affirmed the trial court’s ruling because the officer’s observation of an “unusual bulge” failed to provide an independent basis of reasonable suspicion that would justify further inquiry during the seat belt enforcement stop. Id. at 384.
[8] By contrast, in State v. Morris, 732 N.E.2d 224 (Ind.Ct.App.2000), the defendant failed to produce his driver’s license during a seat belt enforcement stop, which prompted the officer to run a license check. The license check revealed Morris’s driving privileges had been suspended, and the officer asked Morris to step out of his vehicle. As Morris did so, the officer detected an odor of alcohol on his breath. Morris admitted he had been drinking and agreed to submit to a chemical breath test, which revealed an alcohol concentration equivalent of 0.10 grams. The State charged Morris with driving *1073 while suspended and operating a vehicle while intoxicated. Morris filed a motion to suppress, arguing the evidence was obtained in violation of the Act. The trial court granted the motion to suppress, and we reversed, holding (1) the officer was justified in requesting Morris’s license because it was reasonably necessary to issue a citation for failure to wear a seat belt, and (2) that Morris’s failure to produce his driver’s license was a circumstance independent of the initial seat belt violation:
Upon learning that Morris did not have a driver’s license with him, Officer Huskins ran a license check and discovered that Morris’s license was suspended. Morris’s failure to produce his license was a circumstance independent of the initial seatbelt violation, which provided Officer Huskins with reasonable suspicion that Morris might not have a valid driver’s license. After determining that Morris’s license was suspended, Officer Huskins acted reasonably in requesting that Morris exit the vehicle, because he could not allow Morris to continue • driving on a suspended license. When Morris exited the vehicle and Officer Huskins detected the odor of alcoholic beverage on Morris’s breath, a second circumstance independent of the seatbelt stop arose, which led to Officer Huskins’s reasonable suspicion that Morris was driving under the influence.
Id. at 228.
[9] We conclude the facts of the present case are more akin to that in Richardson because Trooper Organ’s only basis for additional questioning was his recollection .of Harris’s name appearing on NPLEx.[3] NPLEx is a database used by *1074 retailers and law enforcement to track and regulate sales of over-the-counter medications containing ephedrine or pseu-doephedrine. Tr. at 7; see also Montgomery v. State, 22 N.E.3d 768, 776 (Ind.Ct.App.2014), trans. denied. Indiana Code section 36-48-4-14.7(e) provides a person may not purchase medications containing more than:
(1) three and six-tenths (3,6) grams of ephedrine or pseudoephedrine, or both, on one (1) day;
(2) seven and two-tenths (7.2) grams of ephedrine or pseudoephedrine, or both, in a thirty (30) day period; or
(3) sixty-one and two-tenths (61.2) grams of ephedrine or pseudoephedrine, or both, in a three hundred sixty-five (365) day period.
In order to enforce these limits, Indiana Code section 35-48-4-14.7(d) imposes certain requirements on pharmacies and other retailers.' Relevant here, retailers shall submit the following information to NPLEx before completing any sale of an over-the-counter medication containing ephedrine or pseudoephedrine: (1) the ephedrine or pseudoephedrine product purchased, including the number of grams the product contains, (2) the date and time of the transaction, (3) the name and address of the purchaser, (4) the type of identification the purchaser presented, and (5) the number and issuing entity of the purchaser’s identification. Ind.Code § 35-48-4-14.7(d)(4), (5). If the NPLEx system generates a stop sale alert, the retailer may not complete the sale. Ind.Code § 35-48-4-14.7(d)(5).
[10] Retailers must comply with the reporting requirements regardless of the customer’s motivation for purchasing the medication. Although ephedrine and pseudoephedrine are commonly used in the manufacture of methamphetamine, medications containing these ingredients are commonplace in the Hoosier medicine cabinet. Particularly during winter cold season and spring allergy season, many law-abiding citizens purchase medications containing ephedrine or pseudoephedrine. Many appear on NPLEx for the simple fact of seeking relief from a stuffy nose. Absent additional circumstances suggesting an intention to manufacture methamphetamine, an individual purchasing these medications within legal limits would not cause an ordinarily prudent person to believe criminal activity has or is about to occur.[4] See Richardson, 927 N.E.2d at 384 (reciting the reasonable suspicion standard).[5]
[11] Our supreme court addressed a similar issue in State v. Bulington, 802 N.E.2d 435 (Ind.2004), a case arising from *1075 a stop based solely on a retailer’s tip that the defendant and his companion had just purchased six boxes of cold medicine containing ephedrine. Each man selected three boxes. They proceeded to different checkout counters and walked out separately but then got into the samé truck in the parking lot. When the police arrived, the truck was pulling out of the parking lot. Officers stopped the truck in an adjacent parking lot and obtained consent to search the truck. The search uncovered hundreds of ephedrine pills and various other materials used to manufacture methamphetamine. The State charged Buling-ton with conspiracy to commit dealing in methamphetamine, possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine, and maintaining a common nuisance. Bul-ington filed a motion to suppress, which the trial court granted. The State appealed, and our supreme court affirmed the trial court, holding the officer lacked reasonable suspicion to stop the defendant’s truck:
The opportunities for official arbitrariness, discretion, and discrimination are simply too great if we were to find that the purchase by two companions of three packages each of cold medicine justifies a search or seizure under art. I, § 11. Such a holding, at least in an Indiana winter, would permit so many searches and seizures as to license official arbitrariness, discretion, and discrimination in their execution.
Id. at 440; see also Saffold v. State, 938 N.E.2d 837, 839 n. 3 (Ind.Ct.App.2010) (rejecting the State’s argument that the discovery of ammunition .in the defendant’s car gave rise to a reasonable suspicion of criminal activity because “something Saf-fold could presumably possess legally ” does not “heighten suspicion something illegal was afoot”), trans. denied.
[12] But the court also noted, “[H]ad additional indicia that ‘criminal activity was afoot’ been available to the police here, the traffic stop at issue might well have been valid.” Bulington, 802 N.E.2d at 440. The court reviewed cases from other jurisdictions and identified specific circumstances that would likely constitute reasonable suspicion:
when the customer (1) purchases a combination of methamphetamine precursors from one store; (2) purchases a combination of precursors from several stores; (3) purchases ... one precursor and then commits a traffic violation warranting a traffic stop; and (4) purchases one precursor and the arresting officer has knowledge of defendant’s previous involvement with methamphetamine.
Id. at 441 (footnotes omitted). The dissent maintains the third circumstance applies in this case because Harris committed a traffic violation, but the case the court relied on to demonstrate this circumstance is easily distinguishable.
[13] The Bulington court cites State v. Vereb, 643 N.W.2d 342 (Minn.Ct.App.2002), which held officers had reasonable suspicion to stop a vehicle where a Wal-Mart employee reported two individuals made several trips into the store to purchase a large number of cold tablets containing pseudoephedrine and the individuals attempted to evade police by traveling at excessive speeds. Bulington, 802 N.E.2d at 441 n. 6 (citing Vereb, 643 N.W.2d at 347). Unlike Harris, the individuals purchased a “large quantity” of pseudoephed-rine at one time immediately before the stop, and the officer had knowledge of these purchases when he initiated the stop. Vereb, 643 N.W.2d at 346. There was also a nexus between the purchases and the traffic violation that strongly suggested the vehicle’s' occupants were or would be engaging in criminal activity. The police pursued the vehicle immediately after its occupants made several trips into the Wal- *1076 Mart store to purchase the pseudoephed-rine, and the driver subsequently led the police on a high-speed chase. When the driver finally pulled over, the officer was free to investigate above and beyond the speeding violation because the stop was not governed by a law intended to limit police authority. See Richardson, 927 N.E.2d at 383 (stating the Act “sought to circumscribe the power of police to use a seat belt stop as an opportunity to inspect, search, or detain on other grounds, even if constitutional law would permit such police behavior”).
[14] In short, Trooper Organ’s recollection of Harris’s name appearing on NPLEx did not provide an independent basis of reasonable suspicion that would justify further investigation. Harris pulled over when Trooper Organ activated his emergency lights, and she produced a valid driver’s license. Trooper Organ’s subsequent questioning about Harris’s destination, her recent cold medicine purchase, and whether she would consent to a search violated the Act, and the trial court erred in denying her motion to suppress the evidence gleaned from that questioning. See Richardson, 927 N.E.2d at 382-83 (stating the Act “could be read to prohibit a police officer making a seat belt stop from even asking the driver for consent to search the vehicle”).
Conclusion
[15] Trooper Organ lacked an independent basis of reasonable suspicion that would justify further inquiry during a seat belt enforcement stop. Because his questioning violated the Act, we reverse the trial court’s order denying Harris’s motion to suppress, and we remand for further proceedings.
[16] Reversed and remanded.
CRONE, J., concurs.
NAJAM, J., dissents with opinion.

. At the time of the traffic stop, Trooper Organ was assigned to the Meth Suppression Team and checked NPLEx on a daily basis.

. Harris’s pseudoephedrine purchases did not exceed legal limits, Tr. at 16; see also State’s ■ Exhibit 2 (NPLEx Person Summary for Lisa Harris).

. The dissent likens this case to Trigg v. State, 725 N.E.2d 446, 448-49 (Ind.Ct.App.2000), and Pearson v. State, 870 N.E.2d 1061 (Ind.Ct.App.2007), trans. denied, but Trigg and Pearson concerned patdown searches for weapons.
An officer may conduct a patdown search for weapons “only when he has a reasonable belief that the suspect is armed and dangerous.” Pearson, 870 N.E.2d at 1065. In Trigg, we held a patdown search for weapons during a seat belt enforcement stop is not a search "solely because of” a violation of the Act. 725 N.E.2d at 448. "Rather, such a search is the result of actions or behavior on the part of the defendant after the initial stop that lead a police officer to fear for his safety.” Id. The purpose of the search is "not to discover evidence of a crime,” we explained, “but to permit the officer to pursue the investigation without fear for his safety and that of others.” Id. at 449 (citation omitted).
In Pearson, a police officer initiated a traffic stop after observing Pearson drive without a seat belt. The officer recognized Pearson and had knowledge of prior incidents during which Pearson had been violent. Based on this knowledge, the officer ordered Pearson out of his vehicle and conducted a patdown search. While performing the patdown, the officer asked Pearson if he had anything on his person. Pearson admitted he possessed marijuana. The officer retrieved the marijuana from Pearson's pocket and placed Pearson under arrest. As the officer finished searching Pearson, he discovered a sleeve containing a white powder later confirmed to contain methamphetamine. We concluded the officer's knowledge of Pearson’s prior violent 'conduct was sufficient to warrant the limited weapons search but held the officer was not justified in asking Pearson if he had anything on this person. 870 N.E.2d at 1068. Specifically, we held the trial court abused its discretion in admitting the marijuana and methamphetamine because both were discovered through improper means in violation of the Act:
[T]he question posed to Pearson by Officer Hastings, during a pat-down search for weapons to which Pearson was cooperating, was an attempt by Officer Hastings to “fish” for evidence of other crimes. Indeed, the question was potentially incriminating, going beyond an inquiry for officer safety purposes, and was posed under very intimidating circumstances.

Id.

We similarly conclude Trooper Organ’s questioning after he requested Harris’s driver’s license was an attempt to "fish” for evidence of other crimes, but the pertinence of Pearson ends there. Trooper Organ did not conduct a *1074 patdown search for weapons, and he did not articulate any reason to believe Harris was armed or dangerous. Reasonable suspicion that criminal activity has or is about to occur is a separate standard more squarely addressed by Richardson and Monis.

. In addition to purchases made within legal limits, it appears NPLEx trades "blocks” and “exceedances.” State's Ex. 1. Harris’s NPLEx Person Summary does not reveal any "blocks” or "exceedances,” id., but if an officer had knowledge that a driver had attempted to purchase ephedrine or pseudoephedrine in excess of legal limits, that knowledge could be an additional circumstance supporting an independent basis of reasonable suspicion.

. That is not say NPLEx reports have no probative value in criminal investigations unless they reveal purchases or attempted purchases exceeding legal limits. But we distinguish probative value, or “relevance,” Sanders v. State, 704 N.E.2d 119, 124 (Ind.1999), from an "objective manifestation” that a person "is, or is about to be, engaged in criminal activity,” Clark v. State, 994 N.E.2d 252, 263-64 (Ind.2013) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Probative value in a criminal investigation is a much lower standard than the circumstances justifying a Terry stop.