NAJAM, Judge,
dissenting.
[17] I respectfully dissent from the majority’s conclusion that Trooper Organ violated Indiana’s Seatbelt Enforcement Act when he investigated Harris for her frequent purchases of products containing pseudoephedrine. The majority’s opinion does not take into account numerous facts relied on by the trial court in its denial of Harris’ motion to suppress. Trooper Organ recognized Harris from the frequency with which her name appeared on the NPLEx, and our precedent expressly permits an officer in a seatbelt stop to take reasonable steps to investigate a driver based on the officer’s actual knowledge of the driver’s identity. The majority declares that the NPLEx is of no probative value to criminal investigations unless it demonstrates on its face illegal pseu-doephedrine purchases or attempted purchases. I cannot wholly agree.
[18] The entire point of the database of pseudoephedrine purchases is to prevent the use of commercially available products in the manufacture of methamphetamine. That use can occur whether the pseu-doephedrine purchases are legal or illegal. At least where, as here, an officer recognizes a person’s name precisely because of how many times the officer has seen that person’s name on the NPLEx, it is reasonable for the officer to suspect that those frequent, albeit legal, pseudoephedrine purchases might indicate criminal activity. To conclude otherwise severely curtails this valuable tool of law enforcement.
[19] As an initial matter, our standard of review in appeals from the denial of a motion to suppress evidence is well settled. “We review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of the evidence. We consider only the evidence favorable to the trial court’s ruling, alongside substantial uncon-tradicted evidence to the contrary, to de *1077 cide if that evidence is sufficient to support the denial.” Clark v. State, 994 N.E.2d 252, 259 (Ind.2013) (citing Holder v. State, 847 N.E.2d 930, 935 (Ind.2006)).
[20] For traffic stops based on seatbelt violations, the Act and the Indiana Supreme Court’s interpretation of it are clear:
Indiana Code section 9-19-10-3.1, also known as the Seatbelt Enforcement Act (“Act”), provides that “a vehicle may be stopped to determine compliance with this chapter. However, a vehicle, the contents of a vehicle, the driver of a vehicle, or a passenger in a vehicle may not be inspected, searched, or detained solely because of a violation of this chapter.” In Baldwin v. Reagan, 715 N.E.2d 332 (Ind.1999), we upheld the constitutionality of [the prior version of the statute] against a challenge that the statute unconstitutionally provided authority for entirely pretextual traffic stops. We reasoned that the statute could be constitutionally applied because under it law enforcement officers could stop motorists only where they had reasonable suspicion that a seat belt violation had occurred. On the basis of the language of the statute, we agreed with the Attorney General’s position that “the statute requires that when a stop to determine seat belt law compliance is made, the police are strictly prohibited from determining anything else, even if other law would permit.” Baldwin, 715 N.E.2d at 339. We also stated that the statute could be read to prohibit a police officer making a seat belt stop from even asking the driver for consent to search the vehicle or its occupants. Id. at 339 n. 8.
At the same time, the •police are not ousted of authority to investigate further if the circumstances warrant. “[A] brief police detention of an individual ■during investigation is reasonable if the officer reasonably suspects that the individual is engaged in, or about to engage in, illegal activity.” Id. at 337. We place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. Id.
[[Image here]]
... The language of the Act and subsequent case law clearly dictate that in adopting the Act, the Legislature intended the statute to limit, rather than expand, police authority with respect to seat belt enforcement stops and sought to circumscribe the power of police to use a seat belt stop as an opportunity to inspect, search, or detain on other grounds, even if. constitutional law would permit such police behavior. See Baldwin, 715 N.E.2d 332. Given the language of the Act. itself, the Attorney General’s own position in Baldiain interpreting that language, and the case law, the Act simply does not permit investigatory behavior based solely on a seat belt violation unless circumstances arise after the stop that independently provide the officer %mih reasonable suspicion of other crimes.
... Baldwin makes clear that “[reasonable suspicion exists where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur.”[6] Baldwin, 715 N.E.2d at 337 (emphasis added).
State v. Richardson, 927 N.E.2d 379, 382-83 (Ind.2010) (last emphasis and second *1078 and third alterations original to Richardson). And, when reviewing a reasonable suspicion determination, we examine the totality of the circumstances to see whether there was a particularized and objective basis for suspecting legal wrongdoing. State v. Renzulli, 958 N.E.2d 1143, 1147-48 (Ind.2011).
In other words, while a traffic stop for a seatbelt violation cannot be turned into a fishing expedition, the Act does not vitiate an officer’s authority to investigate circumstances that become known to the stopping officer after he has initiated the traffic stop. Id. For example, in Pearson v. State, 870 N.E.2d 1061, 1066 (Ind.Ct.App.2007), trans. denied, we held that an officer’s recognition of the driver upon stopping him and the officer’s actual knowledge of the driver’s violent conduct on two prior occasions permitted the officer to further investigate the possible presence of weapons on the driver. Similarly, in Trigg v. State, 725 N.E.2d 446, 448-49 (Ind.Ct.App.2000), we held that the driver’s “nervous” behavior and “fidgeting” after the stop permitted the stopping officer to further investigate the possible presence of weapons on the driver. And in Richardson, our supreme court expressly recognized that Pearson and Trigg “comport with Baldwin.” 927 N.E.2d at 383.
The facts in this case are in line with that precedent. Here, immediately after he pulled his vehicle onto the road to enforce the seatbelt violation, Harris promptly turned down two side streets, which Collins later acknowledged Harris had done in an attempt to avoid Trooper Organ. Then, after he had initiated the traffic stop, Trooper Organ asked Harris for her identification.[7] Upon Harris providing her identification, Trooper Organ immediately “recognized her name from the past as frequently purchasing pseu-doephedrine.” Tr. at 10. Trooper Organ’s recognition of Harris as a “frequentU” purchaser of products containing pseu-doephedrine was based on his experience, training, and familiarity with the NPLEx.
Trooper Organ’s immediate recognition of Harris’ name is analogous to the facts in Pearson, in which the stopping officer recognized the driver and knew of the driver’s violent conduct on two prior occasions. Again, in Pearson we held that the officer’s recognition of the driver and the basis for that recognition permitted the officer to further investigate the possible presence of weapons on the driver. 870 N.E.2d at 1066, Here, in light of Trooper Organ’s immediate recognition of Harris’ name and the reason for that recognition, an ordinarily prudent person would have investigated further. See id.; see also Richardson, 927 N.E.2d at 384.
And that is what Trooper Organ did. He initially questioned Harris at her car. But, rather than dispel Trooper Organ’s concerns, Harris’ behavior and responses' to those questions further raised suspicion. In particular, Trooper Organ observed that, based on his past experiences in traffic stops, Harris “was not acting the same as ... a normal person, under normal circumstances[, would have] acted.” ' Tr. at 8. Rather, Harris “seemed overly excited” and had “slight stuttering of her words.” Id. Further, in response to Trooper Organ’s questions, at first Harris said she was going to a gas station. When Trooper Organ noted that she had just passed a gas station, Harris changed her story and said she was going to get food stamps. When Trooper Organ told her there was nowhere to get food stamps on the road they were on, Collins then volunteered that “they saw [Trooper Organ] pull out of the parking lot and they turned *1079 down Fifth Street to try and avoid [him].” Id.
[25] Harris’ and Collins’ behavior and comments are also analogous to the. circumstances in Trigg, in which we held that the driver’s furtive behavior gave the stopping officer reasonable suspicion to investigate the driver further. 725 N.E.2d at 448-49. Indeed, Trooper Organ’s investigation of Harris in light of Harris’ post-stop behavior, her evasive driving, and Trooper Organ’s actual knowledge that she was a frequent purchaser of pseudoephed-rine products is much more compelling than the circumstances that this court and the Indiana Supreme Court approved in Trigg.
[26] Only after all of those circumstances had occurred did Trooper Organ then search both for Harris and Collins on the NPLEx. While the NPLEx' search did not reveal criminal conduct per sé, it did confirm Trooper Organ’s suspicion that both Harris and Collins were frequent, and recent, purchasers of products containing pseudoephedrine. That confirmation, coupled with the additional circumstances already apparent, permitted Trooper Organ to continue his investigation by asking Harris questions relating to those purchases. Again, that is what Trooper Organ did, and it was that line of questioning that eventually resulted in the discovery of the methamphetamine.
[27] The . majority concludes that Trooper Organ’s knowledge of Harris as a frequent purchaser of products containing pseudoephedrine did not give rise to rear sonable suspicion based on the premise that legal activity cannot support an inference of illegal activity. In support of that position, the. majority relies on our supreme court’s opinion in State v. Bulington, 802 N.E.2d 435 (Ind.2004).[8] But the Indiana Supreme Court did not make such a categorical declaration in Bulington. To the contrary, the Bulington opinion makes clear that even legal purchases, if done in unusual circumstances, can give rise to reasonable suspicion. In particular, the court explicitly noted: “we think it likely that we would find reasonable suspicion to exist” in numerous legal circumstances, including “information that the person legally purchased” more than “a small to moderate amount of one precursor”[9] or where a person “purchases .. 1 one precursor and then commits a traffic violation warranting a traffic stop.” Id. at 441. Both of those situations apply here, where Trooper Organ immediately recognized Harris as “frequently purchasing pseudoephedrine,” Tr. at 10, and the basis for his stop was an independent traffic violation.
[28] Considering the totality of the circumstances, I conclude that the trial court’s judgment is supported by sufficient evidence. Trooper Organ’s post-stop investigation of Harris was not based solely on a seatbelt violation but, instead, on numerous facts and - circumstances that arose after he had initiated the stop, which independently provided Trooper Organ with reasonable suspicion of ongoing criminal conduct. Again, once Trooper Organ initiated the traffic stop, Harris attempted to evade him; upon stopping her, he immediately recognized her name for the frequency with which it had appeared on the NPLEx; and, upon questioning her, she *1080 appeared unusually nervous. After all of those circumstances had presented themselves, Trooper Organ then confirmed on the NPLEx that both Harris and her passenger had made frequent and recent purchases of products containing pseu-doephedrine.
[29] Nothing about the circumstances of Trooper Organ’s investigation demonstrates that he used the seatbelt violation merely to go on a fishing expedition. To the contrary, Trooper Organ’s investigation was simply good police work. The Seatbelt Enforcement Act does not require an officer who stops a motorist to quarantine and disregard the officer’s actual knowledge of the motorist’s identity and previous conduct. And where, as here, that actual knowledge is coupled with evasive and furtive behavior, the officer may connect the dots. Accordingly, I would affirm the trial court’s denial of Harris’ motion to suppress.

. The test for reasonable suspicion is identical under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. E.g., Campos v. State, 885 N.E.2d 590, 597 (Ind.2008).

. No one suggests that a request for a driver’s identification is prohibited by the Act.

. The majority also cites Saffold v. State, 938 N.E.2d 837, 839 n. 3 (Ind.Ct.App.2010), trans. denied, but as Saffold relies on Bulington I need not discuss Saffold separately.

. The defendant ip Bulington made a onetime purchase of three boxes of antihistamines, which, in a 3-2 opinion, the majority of our supreme court characterized as a "small to moderate amount.'’ 802 N.E.2d at 441. Here, in contrast, Harris made nine separate purchases of products containing pseudoephedrine.