FILED

Jul 27 2016, 5:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Larry Crawford Thomas
Clinton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lisa R. Harris,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 27, 2016

Court of Appeals Case No.
83A01-1509-CR-1311

Appeal from the Vermillion Circuit Court

The Honorable Bruce V. Stengel, Judge

Trial Court Cause No.
83C01-1411-F6-57

**Robb, Judge.**

# Case Summary and Issue

[1] Lisa Harris appeals the trial court's denial of her motion to suppress evidence obtained from a consent search during a seat belt enforcement stop. Concluding the officer lacked an independent basis of reasonable suspicion justifying inquiry above and beyond the seat belt violation, we reverse the trial court's order and remand for further proceedings.

# Facts and Procedural History

[2] On November 25, 2014, Indiana State Police Trooper Mike Organ was parked outside a gas station in Clinton, Indiana, when he observed the driver and passenger of a passing vehicle were not wearing seat belts. Trooper Organ pulled out of the parking lot, and the vehicle abruptly turned onto an adjacent street. Trooper Organ followed the vehicle, activated his emergency lights, and initiated a traffic stop. Trooper Organ approached the driver's side and first asked the driver for identification. The driver produced her driver's license, which indicated her name was Lisa Harris. Trooper Organ immediately recognized her name as appearing on National Precursor Log Exchange (NPLEx) reports "in the past." Transcript at 7.[1] Trooper Organ then asked Harris "where she was going, and where she was coming from." *Id.* at 8. Harris stated she was going to a gas station. When Trooper Organ pointed out

---

[1] At the time of the traffic stop, Trooper Organ was assigned to the Meth Suppression Team and checked NPLEx on a daily basis.

she had just passed a gas station and turned onto a street with no gas stations, Harris revised her answer, stating she was actually on her way to apply for food stamps. When Trooper Organ again pointed out Harris was traveling away from her purported destination, Harris's passenger stated they saw Trooper Organ pull out of the parking lot and turned in order to avoid him. Trooper Organ noticed Harris appeared "overly excited" during this brief exchange, so he asked "if there was anything inside of the vehicle that [he] needed to know about[.]" *Id.* at 8-9. Harris stated, "absolutely not." *Id.* at 9.

[3] Trooper Organ returned to his police vehicle to check Harris's driving status, determine whether she had any outstanding warrants, and confirm Harris's name appeared on NPLEx. Harris had a valid driver's license and did not have any outstanding warrants, but NPLEx indicated Harris had purchased pseudoephedrine nine times in the past year.[2] Her most recent purchase occurred four days prior to the traffic stop. With this information, Trooper Organ returned to Harris and asked her to speak with him in his police vehicle. Harris agreed. When Trooper Organ asked Harris if she purchased cold medicine containing pseudoephedrine on November 21, 2014, Harris admitted she had, "for her nose." *Id.* at 12. He then asked where the pills were. Harris stated the pills were at her house, but when Trooper Organ asked if she could

---

[2] Harris's pseudoephedrine purchases did not exceed legal limits. Tr. at 16; *see also* State's Exhibit 2 (NPLEx Person Summary for Lisa Harris).

provide proof of this, Harris admitted the pills were no longer in her possession because she sold them for $20.

[4] Trooper Organ obtained Harris's consent to search her vehicle and its contents. Inside Harris's purse, he discovered a baggie of white powder that field-tested positive for methamphetamine. Harris claimed she forgot about the methamphetamine and admitted she regularly smokes methamphetamine. Trooper Organ cited both Harris and her passenger for failure to wear a seat belt but arrested only Harris. The State charged Harris with possession of methamphetamine as a Level 6 felony. Harris filed a motion to suppress, which the trial court denied. The trial court certified the order for interlocutory appeal, and we accepted jurisdiction pursuant to Indiana Appellate Rule 14(B).

# Discussion and Decision

## I. Standard of Review

[5] We review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of evidence. *Sanders v. State*, 989 N.E.2d 332, 334 (Ind. 2013). We do not reweigh the evidence. *Id.* We consider conflicting evidence most favorable to the trial court's ruling, as well as undisputed evidence favorable to the defendant. *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). "We defer to a trial court's determination of historical fact, but we review *de novo* whether those facts constitute reasonable suspicion." *Johnson v. State*, 21 N.E.3d 841, 844 (Ind. Ct. App. 2014), *trans. denied.* "The record must disclose substantial

evidence of probative value that supports the trial court's decision." *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006).

## II. Motion to Suppress

[6] Harris contends the trial court erred in denying her motion to suppress because Trooper Organ's investigation above and beyond the seat belt violation contravened Indiana's Seatbelt Enforcement Act ("Act"). We agree. Although a vehicle may be stopped to determine compliance with the Act, "a vehicle, the contents of a vehicle, the driver of a vehicle, or a passenger in a vehicle may not be inspected, searched, or detained *solely* because of a violation of [the Act]." Ind. Code § 9-19-10-3.1(a) (emphasis added). "[T]he Act simply does not permit investigatory behavior based solely on a seat belt violation unless circumstances arise after the stop that independently provide the officer with reasonable suspicion of other crimes." *State v. Richardson*, 927 N.E.2d 379, 383 (Ind. 2010).

[7] In *Richardson*, a police officer initiated a traffic stop based solely on her observation of the defendant driving unrestrained by a seat belt. The officer immediately recognized Richardson from a prior traffic stop and recalled no violence or resistance during that encounter. Richardson was cooperative and readily admitted the seat belt violation, but the officer noticed "a very large, unusual bulge" in Richardson's pocket. *Id.* at 381. When the officer asked Richardson what was in his pocket, Richardson said he was carrying a handgun. The officer requested Richardson's gun permit and ran a criminal

background check, which revealed Richardson had a prior conviction for possession of cocaine as a Class D felony. The officer arrested Richardson for possession of a firearm with a prior felony conviction within the past fifteen years. Another officer searched Richardson incident to that arrest and discovered cocaine on his person. The State charged Richardson with dealing in cocaine, among other charges. Prior to trial, Richardson filed a motion to suppress the cocaine. The trial court granted the motion, and the State appealed. Our supreme court affirmed the trial court's ruling because the officer's observation of an "unusual bulge" failed to provide an independent basis of reasonable suspicion that would justify further inquiry during the seat belt enforcement stop. *Id.* at 384.

[8] By contrast, in *State v. Morris*, 732 N.E.2d 224 (Ind. Ct. App. 2000), the defendant failed to produce his driver's license during a seat belt enforcement stop, which prompted the officer to run a license check. The license check revealed Morris's driving privileges had been suspended, and the officer asked Morris to step out of his vehicle. As Morris did so, the officer detected an odor of alcohol on his breath. Morris admitted he had been drinking and agreed to submit to a chemical breath test, which revealed an alcohol concentration equivalent of 0.10 grams. The State charged Morris with driving while suspended and operating a vehicle while intoxicated. Morris filed a motion to suppress, arguing the evidence was obtained in violation of the Act. The trial court granted the motion to suppress, and we reversed, holding (1) the officer was justified in requesting Morris's license because it was reasonably necessary

to issue a citation for failure to wear a seat belt, and (2) that Morris's failure to produce his driver's license was a circumstance independent of the initial seat belt violation:

> Upon learning that Morris did not have a driver's license with him, Officer Huskins ran a license check and discovered that Morris's license was suspended. Morris's failure to produce his license was a circumstance independent of the initial seatbelt violation, which provided Officer Huskins with reasonable suspicion that Morris might not have a valid driver's license. After determining that Morris's license was suspended, Officer Huskins acted reasonably in requesting that Morris exit the vehicle, because he could not allow Morris to continue driving on a suspended license. When Morris exited the vehicle and Officer Huskins detected the odor of alcoholic beverage on Morris's breath, a second circumstance independent of the seatbelt stop arose, which led to Officer Huskins's reasonable suspicion that Morris was driving under the influence.

*Id.* at 228.

[9] We conclude the facts of the present case are more akin to that in *Richardson* because Trooper Organ's only basis for additional questioning was his recollection of Harris's name appearing on NPLEx.[3] NPLEx is a database used

---

[3] The dissent likens this case to *Trigg v. State*, 725 N.E.2d 446, 448-49 (Ind. Ct. App. 2000), and *Pearson v. State*, 870 N.E.2d 1061 (Ind. Ct. App. 2007), *trans. denied*, but *Trigg* and *Pearson* concerned patdown searches for weapons.

An officer may conduct a patdown search for weapons "only when he has a reasonable belief that the suspect is armed and dangerous." *Pearson,* 870 N.E.2d at 1065. In *Trigg*, we held a patdown search for weapons during a seat belt enforcement stop is not a search "solely because of" a violation of the Act. 725 N.E.2d at 448. "Rather, such a search is the result of actions or behavior on the part of the defendant after the initial stop that lead a police officer to fear for his safety." *Id.* The purpose of the search is "not to discover

by retailers and law enforcement to track and regulate sales of over-the-counter medications containing ephedrine or pseudoephedrine. Tr. at 7; *see also Montgomery v. State*, 22 N.E.3d 768, 775 (Ind. Ct. App. 2014), *trans. denied.* Indiana Code section 35-48-4-14.7(e) provides a person may not purchase medications containing more than:

> (1) three and six-tenths (3.6) grams of ephedrine or pseudoephedrine, or both, on one (1) day;
> (2) seven and two-tenths (7.2) grams of ephedrine or pseudoephedrine, or both, in a thirty (30) day period; or
> (3) sixty-one and two-tenths (61.2) grams of ephedrine or pseudoephedrine, or both, in a three hundred sixty-five (365) day period.

---

evidence of a crime," we explained, "but to permit the officer to pursue the investigation without fear for his safety and that of others." *Id.* at 449 (citation omitted).

In *Pearson*, a police officer initiated a traffic stop after observing Pearson drive without a seat belt. The officer recognized Pearson and had knowledge of prior incidents during which Pearson had been violent. Based on this knowledge, the officer ordered Pearson out of his vehicle and conducted a patdown search. While performing the patdown, the officer asked Pearson if he had anything on his person. Pearson admitted he possessed marijuana. The officer retrieved the marijuana from Pearson's pocket and placed Pearson under arrest. As the officer finished searching Pearson, he discovered a sleeve containing a white powder later confirmed to contain methamphetamine. We concluded the officer's knowledge of Pearson's prior violent conduct was sufficient to warrant the limited weapons search but held the officer was not justified in asking Pearson if he had anything on this person. 870 N.E.2d at 1068. Specifically, we held the trial court abused its discretion in admitting the marijuana and methamphetamine because both were discovered through improper means in violation of the Act:

> [T]he question posed to Pearson by Officer Hastings, during a pat-down search for weapons to which Pearson was cooperating, was an attempt by Officer Hastings to "fish" for evidence of other crimes. Indeed, the question was potentially incriminating, going beyond an inquiry for officer safety purposes, and was posed under very intimidating circumstances.

*Id.*

We similarly conclude Trooper Organ's questioning after he requested Harris's driver's license was an attempt to "fish" for evidence of other crimes, but the pertinence of *Pearson* ends there. Trooper Organ did not conduct a patdown search for weapons, and he did not articulate any reason to believe Harris was armed or dangerous. Reasonable suspicion that criminal activity has or is about to occur is a separate standard more squarely addressed by *Richardson* and *Morris*.

In order to enforce these limits, Indiana Code section 35-48-4-14.7(d) imposes certain requirements on pharmacies and other retailers. Relevant here, retailers shall submit the following information to NPLEx before completing *any* sale of an over-the-counter medication containing ephedrine or pseudoephedrine: (1) the ephedrine or pseudoephedrine product purchased, including the number of grams the product contains, (2) the date and time of the transaction, (3) the name and address of the purchaser, (4) the type of identification the purchaser presented, and (5) the number and issuing entity of the purchaser's identification. Ind. Code § 35-48-4-14.7(d)(4), (5). If the NPLEx system generates a stop sale alert, the retailer may not complete the sale. Ind. Code § 35-48-4-14.7(d)(5).

[10] Retailers must comply with the reporting requirements regardless of the customer's motivation for purchasing the medication. Although ephedrine and pseudoephedrine are commonly used in the manufacture of methamphetamine, medications containing these ingredients are commonplace in the Hoosier medicine cabinet. Particularly during winter cold season and spring allergy season, many law-abiding citizens purchase medications containing ephedrine or pseudoephedrine. Many appear on NPLEx for the simple fact of seeking relief from a stuffy nose. Absent additional circumstances suggesting an intention to manufacture methamphetamine, an individual purchasing these medications within legal limits would not cause an ordinarily prudent person to

believe criminal activity has or is about to occur.[4] *See Richardson*, 927 N.E.2d at 384 (reciting the reasonable suspicion standard).[5]

[11]     Our supreme court addressed a similar issue in *State v. Bulington*, 802 N.E.2d 435 (Ind. 2004), a case arising from a stop based solely on a retailer's tip that the defendant and his companion had just purchased six boxes of cold medicine containing ephedrine. Each man selected three boxes. They proceeded to different checkout counters and walked out separately but then got into the same truck in the parking lot. When the police arrived, the truck was pulling out of the parking lot. Officers stopped the truck in an adjacent parking lot and obtained consent to search the truck. The search uncovered hundreds of ephedrine pills and various other materials used to manufacture methamphetamine. The State charged Bulington with conspiracy to commit dealing in methamphetamine, possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine, and maintaining a common nuisance. Bulington filed a motion to suppress, which the trial court

---

[4] In addition to purchases made within legal limits, it appears NPLEx tracks "blocks" and "exceedances." State's Ex. 1. Harris's NPLEx Person Summary does not reveal any "blocks" or "exceedances," *id.*, but if an officer had knowledge that a driver had attempted to purchase ephedrine or pseudoephedrine in excess of legal limits, that knowledge could be an additional circumstance supporting an independent basis of reasonable suspicion.

[5] That is not say NPLEx reports have no probative value in criminal investigations unless they reveal purchases or attempted purchases exceeding legal limits. But we distinguish probative value, or "relevance," *Sanders v. State*, 704 N.E.2d 119, 124 (Ind. 1999), from an "objective manifestation" that a person "is, or is about to be, engaged in criminal activity," *Clark v. State*, 994 N.E.2d 252, 263-64 (Ind. 2013) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Probative value in a criminal investigation is a much lower standard than the circumstances justifying a *Terry* stop.

granted. The State appealed, and our supreme court affirmed the trial court, holding the officer lacked reasonable suspicion to stop the defendant's truck:

> The opportunities for official arbitrariness, discretion, and discrimination are simply too great if we were to find that the purchase by two companions of three packages each of cold medicine justifies a search or seizure under art. I, § 11. Such a holding, at least in an Indiana winter, would permit so many searches and seizures as to license official arbitrariness, discretion, and discrimination in their execution.

*Id.* at 440; *see also Saffold v. State*, 938 N.E.2d 837, 839 n.3 (Ind. Ct. App. 2010) (rejecting the State's argument that the discovery of ammunition in the defendant's car gave rise to a reasonable suspicion of criminal activity because "something Saffold could presumably possess *legally*" does not "heighten suspicion something *illegal* was afoot"), *trans. denied.*

[12] But the court also noted, "[H]ad additional indicia that 'criminal activity was afoot' been available to the police here, the traffic stop at issue might well have been valid." *Bulington*, 802 N.E.2d at 440. The court reviewed cases from other jurisdictions and identified specific circumstances that would likely constitute reasonable suspicion:

> when the customer (1) purchases a combination of methamphetamine precursors from one store; (2) purchases a combination of precursors from several stores; (3) purchases . . . one precursor and then commits a traffic violation warranting a traffic stop; and (4) purchases one precursor and the arresting officer has knowledge of defendant's previous involvement with methamphetamine.

*Id.* at 441 (footnotes omitted). The dissent maintains the third circumstance applies in this case because Harris committed a traffic violation, but the case the court relied on to demonstrate this circumstance is easily distinguishable.

[13] The *Bulington* court cites *State v. Vereb*, 643 N.W.2d 342 (Minn. Ct. App. 2002), which held officers had reasonable suspicion to stop a vehicle where a Wal-Mart employee reported two individuals made several trips into the store to purchase a large number of cold tablets containing pseudoephedrine and the individuals attempted to evade police by traveling at excessive speeds. *Bulington*, 802 N.E.2d at 441 n.6 (citing *Vereb*, 643 N.W.2d at 347). Unlike Harris, the individuals purchased a "large quantity" of pseudoephedrine at one time immediately before the stop, and the officer had knowledge of these purchases when he initiated the stop. *Vereb*, 643 N.W.2d at 345. There was also a nexus between the purchases and the traffic violation that strongly suggested the vehicle's occupants were or would be engaging in criminal activity. The police pursued the vehicle immediately after its occupants made several trips into the Wal-Mart store to purchase the pseudoephedrine, and the driver subsequently led the police on a high-speed chase. When the driver finally pulled over, the officer was free to investigate above and beyond the speeding violation because the stop was not governed by a law intended to limit police authority. *See Richardson*, 927 N.E.2d at 383 (stating the Act "sought to circumscribe the power of police to use a seat belt stop as an opportunity to inspect, search, or detain on other grounds, even if constitutional law would permit such police behavior").

In short, Trooper Organ's recollection of Harris's name appearing on NPLEx did not provide an independent basis of reasonable suspicion that would justify further investigation. Harris pulled over when Trooper Organ activated his emergency lights, and she produced a valid driver's license. Trooper Organ's subsequent questioning about Harris's destination, her recent cold medicine purchase, and whether she would consent to a search violated the Act, and the trial court erred in denying her motion to suppress the evidence gleaned from that questioning. *See Richardson*, 927 N.E.2d at 382-83 (stating the Act "could be read to prohibit a police officer making a seat belt stop from even asking the driver for consent to search the vehicle").

## Conclusion

Trooper Organ lacked an independent basis of reasonable suspicion that would justify further inquiry during a seat belt enforcement stop. Because his questioning violated the Act, we reverse the trial court's order denying Harris's motion to suppress, and we remand for further proceedings.

Reversed and remanded.

Crone, J., concurs.

Najam, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Lisa R. Harris
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

Court of Appeals Case No.
83A01-1509-CR-1311

**Najam, Judge, dissenting.**

[17] I respectfully dissent from the majority's conclusion that Trooper Organ violated Indiana's Seatbelt Enforcement Act when he investigated Harris for her frequent purchases of products containing pseudoephedrine. The majority's opinion does not take into account numerous facts relied on by the trial court in its denial of Harris' motion to suppress. Trooper Organ recognized Harris from the frequency with which her name appeared on the NPLEx, and our precedent expressly permits an officer in a seatbelt stop to take reasonable steps to investigate a driver based on the officer's actual knowledge of the driver's

identity. The majority declares that the NPLEx is of no probative value to criminal investigations unless it demonstrates on its face illegal pseudoephedrine purchases or attempted purchases. I cannot wholly agree.

[18] The entire point of the database of pseudoephedrine purchases is to prevent the use of commercially available products in the manufacture of methamphetamine. That use can occur whether the pseudoephedrine purchases are legal or illegal. At least where, as here, an officer recognizes a person's name precisely because of how many times the officer has seen that person's name on the NPLEx, it is reasonable for the officer to suspect that those frequent, albeit legal, pseudoephedrine purchases might indicate criminal activity. To conclude otherwise severely curtails this valuable tool of law enforcement.

[19] As an initial matter, our standard of review in appeals from the denial of a motion to suppress evidence is well settled. "We review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of the evidence. We consider only the evidence favorable to the trial court's ruling, alongside substantial uncontradicted evidence to the contrary, to decide if that evidence is sufficient to support the denial." *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013) (citing *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006)).

[20] For traffic stops based on seatbelt violations, the Act and the Indiana Supreme Court's interpretation of it are clear:

Indiana Code section 9-19-10-3.1, also known as the Seatbelt Enforcement Act ("Act"), provides that "a vehicle may be stopped to determine compliance with this chapter. However, a vehicle, the contents of a vehicle, the driver of a vehicle, or a passenger in a vehicle may not be inspected, searched, or detained solely because of a violation of this chapter." In *Baldwin v. Reagan*, 715 N.E.2d 332 (Ind. 1999), we upheld the constitutionality of [the prior version of the statute] against a challenge that the statute unconstitutionally provided authority for entirely pretextual traffic stops. We reasoned that the statute could be constitutionally applied because under it law enforcement officers could stop motorists only where they had reasonable suspicion that a seat belt violation had occurred. On the basis of the language of the statute, we agreed with the Attorney General's position that "the statute requires that when a stop to determine seat belt law compliance is made, the police are strictly prohibited from determining anything else, even if other law would permit." *Baldwin*, 715 N.E.2d at 339. We also stated that the statute could be read to prohibit a police officer making a seat belt stop from even asking the driver for consent to search the vehicle or its occupants. *Id.* at 339 n.8.

*At the same time, the police are not ousted of authority to investigate further if the circumstances warrant. "[A] brief police detention of an individual during investigation is reasonable if the officer reasonably suspects that the individual is engaged in, or about to engage in, illegal activity." Id. at 337.* We place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. *Id.*

\* \* \*

 . . . The language of the Act and subsequent case law clearly dictate that in adopting the Act, the Legislature intended the statute to limit, rather than expand, police authority with respect to seat belt enforcement stops and sought to circumscribe the

power of police to use a seat belt stop as an opportunity to inspect, search, or detain on other grounds, even if constitutional law would permit such police behavior. *See Baldwin*, 715 N.E.2d 332. Given the language of the Act itself, the Attorney General's own position in *Baldwin* interpreting that language, and the case law, the Act simply does not permit investigatory behavior based *solely* on a seat belt violation *unless circumstances arise after the stop that independently provide the officer with reasonable suspicion of other crimes.*

. . . *Baldwin* makes clear that "[r]easonable suspicion exists where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause *an ordinarily prudent person* to believe that criminal activity has or is about to occur."[6] *Baldwin*, 715 N.E.2d at 337 (emphasis added).

*State v. Richardson*, 927 N.E.2d 379, 382-83 (Ind. 2010) (last emphasis and second and third alterations original to *Richardson*). And, when reviewing a reasonable suspicion determination, we examine the totality of the circumstances to see whether there was a particularized and objective basis for suspecting legal wrongdoing. *State v. Renzulli*, 958 N.E.2d 1143, 1147-48 (Ind. 2011).

[21] In other words, while a traffic stop for a seatbelt violation cannot be turned into a fishing expedition, the Act does not vitiate an officer's authority to investigate circumstances that become known to the stopping officer after he has initiated

---

[6] The test for reasonable suspicion is identical under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. *E.g.*, *Campos v. State*, 885 N.E.2d 590, 597 (Ind. 2008).

the traffic stop. *Id.* For example, in *Pearson v. State*, 870 N.E.2d 1061, 1066 (Ind. Ct. App. 2007), *trans. denied*, we held that an officer's recognition of the driver upon stopping him and the officer's actual knowledge of the driver's violent conduct on two prior occasions permitted the officer to further investigate the possible presence of weapons on the driver. Similarly, in *Trigg v. State*, 725 N.E.2d 446, 448-49 (Ind. Ct. App. 2000), we held that the driver's "nervous" behavior and "fidgeting" after the stop permitted the stopping officer to further investigate the possible presence of weapons on the driver. And in *Richardson*, our supreme court expressly recognized that *Pearson* and *Trigg* "comport with *Baldwin*." 927 N.E.2d at 383.

[22] The facts in this case are in line with that precedent. Here, immediately after he pulled his vehicle onto the road to enforce the seatbelt violation, Harris promptly turned down two side streets, which Collins later acknowledged Harris had done in an attempt to avoid Trooper Organ. Then, after he had initiated the traffic stop, Trooper Organ asked Harris for her identification.[7] Upon Harris providing her identification, Trooper Organ immediately "recognized her name from the past as frequently purchasing pseudoephedrine." Tr. at 10. Trooper Organ's recognition of Harris as a "frequent[]" purchaser of products containing pseudoephedrine was based on his experience, training, and familiarity with the NPLEx.

---

[7] No one suggests that a request for a driver's identification is prohibited by the Act.

[23]     Trooper Organ's immediate recognition of Harris' name is analogous to the facts in *Pearson*, in which the stopping officer recognized the driver and knew of the driver's violent conduct on two prior occasions. Again, in *Pearson* we held that the officer's recognition of the driver and the basis for that recognition permitted the officer to further investigate the possible presence of weapons on the driver. 870 N.E.2d at 1066. Here, in light of Trooper Organ's immediate recognition of Harris' name and the reason for that recognition, an ordinarily prudent person would have investigated further. *See id.*; *see also Richardson*, 927 N.E.2d at 384.

[24]     And that is what Trooper Organ did. He initially questioned Harris at her car. But, rather than dispel Trooper Organ's concerns, Harris' behavior and responses to those questions further raised suspicion. In particular, Trooper Organ observed that, based on his past experiences in traffic stops, Harris "was not acting the same as . . . a normal person, under normal circumstances[, would have] acted." Tr. at 8. Rather, Harris "seemed overly excited" and had "slight stuttering of her words." *Id.* Further, in response to Trooper Organ's questions, at first Harris said she was going to a gas station. When Trooper Organ noted that she had just passed a gas station, Harris changed her story and said she was going to get food stamps. When Trooper Organ told her there was nowhere to get food stamps on the road they were on, Collins then volunteered that "they saw [Trooper Organ] pull out of the parking lot and they turned down Fifth Street to try and avoid [him]." *Id.*

[25] Harris' and Collins' behavior and comments are also analogous to the circumstances in *Trigg*, in which we held that the driver's furtive behavior gave the stopping officer reasonable suspicion to investigate the driver further. 725 N.E.2d at 448-49. Indeed, Trooper Organ's investigation of Harris in light of Harris' post-stop behavior, her evasive driving, and Trooper Organ's actual knowledge that she was a frequent purchaser of pseudoephedrine products is much more compelling than the circumstances that this court and the Indiana Supreme Court approved in *Trigg*.

[26] Only after all of those circumstances had occurred did Trooper Organ then search both for Harris and Collins on the NPLEx. While the NPLEx search did not reveal criminal conduct per se, it did confirm Trooper Organ's suspicion that both Harris and Collins were frequent, and recent, purchasers of products containing pseudoephedrine. That confirmation, coupled with the additional circumstances already apparent, permitted Trooper Organ to continue his investigation by asking Harris questions relating to those purchases. Again, that is what Trooper Organ did, and it was that line of questioning that eventually resulted in the discovery of the methamphetamine.

[27] The majority concludes that Trooper Organ's knowledge of Harris as a frequent purchaser of products containing pseudoephedrine did not give rise to reasonable suspicion based on the premise that legal activity cannot support an inference of illegal activity. In support of that position, the majority relies on

our supreme court's opinion in *State v. Bulington*, 802 N.E.2d 435 (Ind. 2004).[8] But the Indiana Supreme Court did not make such a categorical declaration in *Bulington*. To the contrary, the *Bulington* opinion makes clear that even legal purchases, if done in unusual circumstances, can give rise to reasonable suspicion. In particular, the court explicitly noted: "we think it likely that we would find reasonable suspicion to exist" in numerous legal circumstances, including "information that the person legally purchased" more than "a small to moderate amount of one precursor"[9] or where a person "purchases . . . one precursor and then commits a traffic violation warranting a traffic stop." *Id.* at 441. Both of those situations apply here, where Trooper Organ immediately recognized Harris as "frequently purchasing pseudoephedrine," Tr. at 10, and the basis for his stop was an independent traffic violation.

[28]  Considering the totality of the circumstances, I conclude that the trial court's judgment is supported by sufficient evidence. Trooper Organ's post-stop investigation of Harris was not based solely on a seatbelt violation but, instead, on numerous facts and circumstances that arose after he had initiated the stop, which independently provided Trooper Organ with reasonable suspicion of ongoing criminal conduct. Again, once Trooper Organ initiated the traffic stop,

---

[8] The majority also cites *Saffold v. State*, 938 N.E.2d 837, 839 n.3 (Ind. Ct. App. 2010), *trans. denied*, but as *Saffold* relies on *Bulington* I need not discuss *Saffold* separately.

[9] The defendant in *Bulington* made a one-time purchase of three boxes of antihistamines, which, in a 3-2 opinion, the majority of our supreme court characterized as a "small to moderate amount." 802 N.E.2d at 441. Here, in contrast, Harris made nine separate purchases of products containing pseudoephedrine.

Harris attempted to evade him; upon stopping her, he immediately recognized her name for the frequency with which it had appeared on the NPLEx; and, upon questioning her, she appeared unusually nervous. After all of those circumstances had presented themselves, Trooper Organ then confirmed on the NPLEx that both Harris and her passenger had made frequent and recent purchases of products containing pseudoephedrine.

[29] Nothing about the circumstances of Trooper Organ's investigation demonstrates that he used the seatbelt violation merely to go on a fishing expedition. To the contrary, Trooper Organ's investigation was simply good police work. The Seatbelt Enforcement Act does not require an officer who stops a motorist to quarantine and disregard the officer's actual knowledge of the motorist's identity and previous conduct. And where, as here, that actual knowledge is coupled with evasive and furtive behavior, the officer may connect the dots. Accordingly, I would affirm the trial court's denial of Harris' motion to suppress.