## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 16 2018, 10:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Otto Sutton,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | July 16, 2018<br><br>Court of Appeals Case No.<br>49A02-1712-CR-2916<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Alicia Gooden, Judge<br><br>Trial Court Cause No.<br>49G21-1504-F2-13642 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Otto Sutton was found guilty of dealing in a narcotic drug and dealing in cocaine, both Level 2 felonies, and possession of a narcotic drug and possession of cocaine, both Level 4 felonies. The trial court entered judgments of conviction on all four counts. In the second phase of the bifurcated trial, Sutton waived his right to a jury and the court found Sutton to be an habitual offender. At sentencing, the trial court merged the two counts of possession with the two counts of dealing and sentenced Sutton to a total of twenty-five years, with five years suspended to probation.

[2] Sutton now appeals, raising four issues for our review which we restate as: (1) whether a patdown search of Sutton violated the Fourth Amendment of the United States Constitution or Article 1, Section 11, of the Indiana Constitution; (2) whether jury instructions which failed to inform the jury that it must find there was evidence of intent to deliver in addition to the weight of the drugs amounted to fundamental error; (3) whether there was sufficient evidence that Sutton was an habitual offender; and (4) whether the trial court erred when it merged the counts of possession with the counts of dealing without vacating the formal judgments of conviction. Concluding the patdown search was a reasonable *Terry* frisk, the jury instructions did not rise to the level of fundamental error, there was sufficient evidence that Sutton was an habitual offender, and the trial court erred when it merged both counts of possession with both counts of dealing without vacating the formal judgments of conviction, we affirm in part, reverse in part, and remand.

# Facts and Procedural History[1]

[3] On April 16, 2015, Brady Ball, a canine officer with the Indianapolis Metropolitan Police Department ("IMPD"), received a telephone call from Eric Jensen, an agent with the Bureau of Alcohol, Tobacco, and Firearms, regarding an ongoing narcotics investigation. Officer Ball was familiar with Agent Jensen from their work together on multi-jurisdictional task forces some ten years prior. Agent Jensen informed Officer Ball that he had "fresh" information that Sutton was in the area of 40th Street and Arlington Avenue traveling in a "red tow truck" and in possession of "a large amount of narcotics and a firearm." Transcript, Volume 2 at 66. Agent Jensen urged Officer Ball to "get up there as soon as possible" because Sutton "was there at that point in time." *Id.*

[4] Officer Ball had arrested Sutton "in [the] middle 2000s" for a drug offense and had contact with him on "at least two other occasions" where Sutton was arrested in connection with a narcotics investigation, resisting law enforcement, and "an investigation with a gun." *Id.* at 66-67. After speaking with Agent Jenson, Officer Ball "did a couple of computer checks on Mr. Sutton to look at the case reports. I pulled up what I think was a photo that's in the system of Mr. Sutton and then I headed up to the area around 40th and Arlington." *Id.* at 68.

---

[1] We heard oral argument in Indianapolis, Indiana, at the Jewish Community Center on June 21, 2018. We thank the members of the Jewish Community Center and our hosts, Ken Newton and Lev Rothenberg, for their generous hospitality and commend counsel for their skilled and informative oral advocacy.

[5] Almost immediately upon arriving in the area described by Agent Jensen, Officer Ball located a red tow truck and began observing the vehicle. As Officer Ball approached, he noticed "extremely excessive" window tinting and a lack of identifying markers required on tow trucks such as a name and phone number, a Department of Transportation ("DOT") number, and a license plate. *Id.* at 70-71, 86. Officer Ball then began following the vehicle and noted that it paused for an "inordinate amount of time" at a three-way intersection. *Id*. at 73. The vehicle eventually displayed a turn signal and made a right-hand turn, but only after Officer Ball used his air horn. At this point, having observed the passenger side of the vehicle and confirming that the vehicle had a "full tint job," and still unable to locate identifying markings, a DOT number, or a license plate, Officer Ball activated his emergency lights and attempted to conduct a traffic stop. *Id.* at 77.

[6] Despite Officer Ball's use of emergency lights and repeated activation of the car's siren, the tow truck continued westbound for a block and turned northbound before eventually coming to a stop after a short distance in the "middle of the road," which "blocked a driveway and . . . blocked the entire street." *Id*. at 79. Officer Ball used his PA system to instruct the driver of the vehicle to move to a spot about twenty-five yards away and pull over. Officer Ball later testified that drivers who refuse to stop often "either . . . are going to flee or they want to get a position or a place that's more beneficial to them." *Id.* at 81. As the vehicle complied, Officer Ball noticed a group of three adult females and "some children and maybe some teenagers" that were walking

toward the tow truck. *Id.* "[P]eople [were] really paying close attention from that driveway that he pulled in front of that were very focused on the red tow truck and now me." *Id*. at 81-82. Fearing a "distinct officer safety disadvantage," Officer Ball requested back-up before stepping out of his vehicle and addressing the three women who had approached the tow truck. Officer Ball asked, "do you know this dude, or words to that effect," and two of the girls said no, but one said, "yeah, we know him." *Id.* at 83.

[7] Officer Ball conducted a passenger-side approach of the vehicle; identified Sutton, the sole occupant of the vehicle; and informed him why he had been stopped. Sutton produced a temporary license plate and a driver's license but no registration for the vehicle, stating that it belonged to both him and his father. Officer Ball instructed Sutton to exit the vehicle and sit on the bumper of his police car while he ran the vehicle's information and checked for warrants. Despite repeated efforts, Officer Ball was unable to locate the vehicle's registration, and Sutton eventually admitted that the vehicle belonged only to his father. Around this time, and approximately six minutes after the initial traffic stop, back-up arrived in the form of IMPD Officer Jerome Harrison. Officer Ball handed his ticket book to Harrison and instructed him to write Sutton citations for several traffic infractions while he walked his canine around Sutton's vehicle before warning, "Watch this dude . . . he may run." *Id.* at 97.

[8] Officer Ball's canine alerted to the presence of narcotics by the driver's side door of Sutton's vehicle. When Officer Ball informed Sutton that the canine

had alerted to his vehicle, there was "a distinct change in Mr. Sutton's demeanor. He stood up." Tr., Vol. 3 at 34. Officer Ball instructed Sutton to sit back down and proceeded to inform Sutton of his *Miranda* rights. Sutton crossed his arms and looked from Officer Ball to the people gathered nearby and then back at Officer Ball. About halfway through Officer Ball's recitation, Sutton again attempted to stand up and was instructed to sit down. Officer Ball then

> started over again with Mr. Sutton, explaining to him that there was a dog hit, and I started going back into the *Miranda* warning. At that point, he stood up and it was, in my mind, two things were going to happen. It was either going to be fight or flight. I immediately told Mr. Sutton, huh-uh (no). Turn around and put your hands on the vehicle. At that point, with his hands on the vehicle, I conducted a pat[-]down of him.

*Id.* at 35-36.

[9]     Officer Ball initiated the pat-down at the front waist of Sutton's shorts and "felt this hard lumpy . . . substance with kind of co[a]rse, rough edges, and immediately, I knew it was drugs, most consistent with most likely cocaine in bulk form." *Id.* at 39. Officer Ball signaled to the nearby officers, and they handcuffed Sutton. Once Officer Ball obtained plastic gloves, he lifted up Sutton's shirt and retrieved a purple Crown Royal bag containing 24.95 grams of heroin, 11.87 grams of crack cocaine, and 5.58 grams of powder cocaine.

[10]    Officer Ball then conducted a full search of Sutton's person. This search revealed $1,530 in Sutton's pocket composed of "twenty-two $1 bills, nine $2

bills, twelve $5 bills, ten $10 bills, fifty-four $20 bills, one $50, and two $100 bills." *Id.* at 45. Sutton threw up following the search. Officer Ball also conducted a search of Sutton's vehicle pursuant to his canine's alert and seized three cell phones—one smartphone and two flip phones—but no other paraphernalia common to drug users.

[11] On April 21, 2015, the State charged Sutton with Count I, dealing in a narcotic drug, a Level 2 felony; Count II, possession of a narcotic drug, a Level 4 felony; Count III, dealing in cocaine, a Level 2 felony; Count IV, possession of cocaine, a Level 4 felony; and alleged he was an habitual offender.

[12] Sutton filed a Motion to Suppress on May 16, 2017. The trial court conducted a hearing and denied the Motion to Suppress, and Sutton's case proceeded to trial on September 19. There, the State presented the testimony of Officers Ball and Harrison regarding the underlying traffic stop, Sutton's arrest, and Sutton's appearance and condition on the date in question. IMPD Detective Jeremy Ingram, a twenty-year veteran of the police force, also testified regarding evidence of drug dealing and his fourteen years of experience dealing almost exclusively with narcotics. He testified that he had conducted approximately 1,000 undercover purchases of illegal drugs including cocaine and opiates and was familiar with the differing characteristics of drug dealers and drug users. Detective Ingram explained that a user of cocaine, a stimulant, may suffer from agitation while a user of heroin, a depressant, may be tired and quiet, and that both types of users display, among other things, poor hygiene, loss of teeth, body odor, and sunken eyes.

[13]     Detective Ingram testified that a distinguishing characteristic between addicts and dealers is that dealers possess multiple types of drugs, and he emphasized how unusual it would be for an addict to be in possession of such a large amount of heroin or crack cocaine. He explained:

> I've been in law enforcement for almost 20 years now, I have never met an addict that was addicted to two different substances at the same time that was taking heroin and cocaine. Some of them limit addiction so bad they don't drink or smoke cigarettes. They don't do - they, literally, just do that drug.

*Id.* at 114.

[14]     Sutton possessed varying amounts of heroin, crack cocaine, and cocaine, in accordance with their profitability. *Id.* at 125-26. He possessed heroin in the largest quantity, slightly less than one ounce, which could cost $2,500 and from which a dealer could make a profit of $3,500. *Id.* at 131. Sutton possessed less than a half an ounce of crack cocaine, $700 worth, which could fetch a profit of $300. *Id.* at 130. And finally, Sutton possessed less than a "quad" of cocaine, the least profitable substance. Detective Ingram explained that drug dealers often leave scales and drug-packaging material at a central location and that dealers often have several cell phones, usually "cheap flip phone[s]" which are referred to as "burner phone[s]." *Id.* at 124. Additionally, the $20 bill is the most common denomination for drug dealing, and Sutton possessed $1,080 worth of $20 bills among the $1,580 found on his person. *Id.* at 127.

[15] In final arguments, the State emphasized Sutton's "variety store" type of dealing. *Id.* at 174. The State relied upon Detective Ingram's testimony to prove intent to deal and pointed to evidence such as the variety and amounts of drugs that Sutton possessed, his lack of addict characteristics, and his possession of three cell phones. The jury found Sutton guilty of all charges and the trial court orally entered judgments of conviction on all four counts.

[16] Sutton waived his right to trial by jury in the habitual offender phase of the trial. The State produced certified documents regarding two prior felony convictions, and the trial court found Sutton was an habitual offender.

[17] At sentencing on November 27, 2017, the trial court recognized double jeopardy implications and merged the two counts of possession with the two counts of dealing. The trial court then sentenced Sutton to an aggregate sentence of twenty years to be served in the Indiana Department of Correction and five years suspended to probation. Sutton now appeals.

# Discussion and Decision

## I. Search and Seizure

### A. Standard of Review

[18] Sutton frames this issue as an appeal of the denial of a motion to suppress, and we review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of the evidence. *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006). However, because Sutton is appealing from a completed trial, "the question of

whether the trial court erred in denying a motion to suppress is no longer viable." *Cochran v. State*, 843 N.E.2d 980, 982 (Ind. Ct. App. 2006), *trans. denied*, *cert. denied*, 549 U.S. 1122 (2007). In such cases, "the appeal is best framed as challenging the admission of evidence at trial." *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013).

> The general admission of evidence at trial is a matter we leave to the discretion of the trial court. We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Id*. at 259-60 (citations omitted).

[19] Before proceeding, we note that Sutton stipulated the underlying traffic stop was valid, Tr., Vol. 2 at 245, and Sutton concedes the issue on appeal, Br. of Appellant at 19. It is well settled that a police officer may stop a vehicle upon observing a minor traffic violation, *Reinhart v. State*, 930 N.E.2d 42, 46 (Ind. Ct. App. 2010), and it is not unreasonable under either the federal or Indiana constitutions for an officer to make a pretextual traffic stop so long as they possess probable cause, *Whren v. United States*, 517 U.S. 806, 810 (1996); *Mitchell v. State*, 745 N.E.2d 775, 787 (Ind. 2001).

## B. Reasonable Suspicion that Sutton May be Armed and Dangerous

[20] In the first of four issues presented for appeal, Sutton argues that Officer Ball lacked reasonable suspicion to believe he may be armed and dangerous, thus

the pat-down search of his person violated the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The State, in turn, argues Officer Ball possessed such reasonable suspicion, or, alternatively, that the pat-down was a valid search incident to arrest.

### 1. Fourth Amendment

The Fourth Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. A search conducted without a warrant is per se unreasonable unless it falls within a "few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967).

One exception to the warrant requirement is a protective search for weapons during a lawful stop, often called a *Terry* pat-down or *Terry* frisk. *Terry v. Ohio*, 392 U.S. 1, 26-27 (1968). When an officer does not have probable cause to arrest a person, he or she may conduct a *Terry* pat-down only if two conditions are met: (1) the stop must be lawful, *Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (citing *Terry*, 392 U.S. at 26-27); and (2) the officer must "reasonably suspect that the person stopped is armed and dangerous." *Id*. A generalized suspicion that an individual presents a threat to an officer's safety is insufficient

to authorize a *Terry* frisk; rather, articulable facts must exist to support an officer's reasonable belief that the particular individual is armed and dangerous. *Tumblin v. State*, 736 N.E.2d 317, 322 (Ind. Ct. App. 2000), *trans. denied.* "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. This court has routinely held that traffic stops for infractions, without more, are insufficient to provide reasonable suspicion for a *Terry* frisk. *See, e.g.*, *State v. Pease*, 531 N.E.2d 1207, 1211 (Ind. Ct. App. 1988).

[23] In denying Sutton's Motion to Suppress, the trial court found Officer Ball possessed reasonable suspicion that Sutton may be armed and dangerous based upon "numerous articulable facts" including: (1) the information from Agent Jensen that Sutton was in possession of "a large amount of narcotics and a firearm"; (2) Officer Ball's own research and experience with Sutton; (3) Sutton's failure to immediately stop and the location and manner in which he finally fully stopped; (4) Officer Ball's canine alerting to Sutton's driver's side door; and (5) Sutton's change in demeanor, nervousness, and repeated attempts to stand up. Appellant's Appendix, Volume III at 103-04. The trial court then concluded, "Based upon the totality of circumstances known to Officer Ball, he had reasonable suspicion to conduct a patdown of [Sutton]." *Id.* at 104. Additionally, the State produced testimony the traffic stop occurred in a "high crime area." Tr., Vol. 2 at 67.

On appeal, Sutton proceeds to analyze each of the foregoing factors independently, before summarily concluding that none of the factors support a finding of reasonable suspicion. This, however, is the flaw of Sutton's argument. Reasonable suspicion is determined under the totality of the circumstances, not individual factors analyzed in isolation. *U.S. v. Sokolow*, 490 U.S. 1, 8 (1989). Indeed, even "a set of individually innocent facts, when viewed in conjunction, can be sufficient to create reasonable suspicion," *Finger v. State,* 799 N.E.2d 528, 534 (Ind. 2003), and the facts presented here are more than innocent. Officer Ball, who was familiar with Sutton and his criminal history including an investigation involving a firearm, received a tip that Sutton was in possession of firearm. When Officer Ball attempted to conduct a traffic stop, Sutton refused to pull over and proceeded to an area where he knew bystanders. Officer Ball's canine alerted to the driver's side door of Sutton's vehicle, Sutton's demeanor changed when informed thereof, and Sutton repeatedly attempted to stand up, despite Officer Ball's orders to stay seated. Officer Ball also observed a "fight or flight" response, and the traffic stop occurred in a high crime area. Even assuming that none of these factors constitute reasonable suspicion in isolation, under the totality of the circumstances, we unhesitatingly conclude that Officer Ball possessed reasonable suspicion to believe that Sutton may be armed and dangerous. *See, e.g.*, *Patterson v. State*, 958 N.E.2d 478, 486-88 (Ind. Ct. App. 2011) (*Terry* frisk was justified during a traffic stop in a high crime area where officer detected odor of marijuana). Therefore, the Fourth Amendment permits a *Terry* frisk of

Sutton's person, and the trial court did not abuse its discretion by admitting such evidence.

## 2. Article 1, Section 11

Sutton also argues his search was unreasonable under Article 1, Section 11 of the Indiana Constitution.

Although Article 1, Section 11 of the Indiana Constitution shares the same language as the Fourth Amendment, we interpret and apply the provision independently. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). "Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010) (internal quotation marks omitted). It is the State's burden to show its intrusion was reasonable. *Bulington*, 802 N.E.2d at 438.

To determine reasonableness, we consider: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

### a. Degree of Suspicion

In evaluating the degree of suspicion that Sutton may be armed and dangerous, we consider "the reasonableness of the officers' assumptions, suspicions, or beliefs based on the information available to them at the time." *Duran*, 930

N.E.2d at 18. Here, we rely on our discussion concerning reasonable suspicion under the Fourth Amendment, *see supra* ¶¶ 21-24, and conclude that under the totality of the circumstances, there was a high degree of suspicion that Sutton may be armed and dangerous. Thus, this factor weighs in favor of the State.

## b. Degree of Intrusion

[29] Having concluded Officer Ball possessed the requisite degree of suspicion to conduct a pat-down of Sutton's person for weapons, we turn to the degree of intrusion caused by the pat-down. We evaluate the degree of intrusion from the defendant's point of view, *Duran*, 930 N.E.2d at 18, and consider "the nature of the privacy interest upon which the search intrudes and the character of the intrusion itself," *Chest v. State*, 922 N.E.2d 621, 624 (Ind. Ct. App. 2009).

[30] Sutton argues that the pat-down was highly intrusive because it "focused on [his] front waistband, which is of course a private and sensitive area of the body." Br. of Appellant at 27. Although we remain mindful that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security," *Terry*, 392 U.S. at 24-25, it is well-known that individuals often conceal firearms along their waistband. The record reveals the pat-down was quite ordinary, lasting only a matter of seconds, conducted outside of Sutton's clothing, and aimed at the area in which many, if not most, firearms are concealed. Under the totality of these circumstances, such intrusion was minimal. *See J.R. v. State*, 89 N.E.3d 408, 412 (Ind. Ct. App. 2017) (holding "ordinary pat-down search" did not violate Article 1, Section 11), *aff'd in relevant part*, 2018 WL 3099178.

### c. Extent of Law Enforcement Needs

[31] Finally, Sutton argues the extent of law enforcement needs was low because there were three officers present and the bystanders were cooperative.

[32] "Indiana citizens are concerned not only with personal privacy but also with safety, security, and protection from crime. . . . [R]easonableness under the totality of circumstances may include consideration of police officer safety." *Saffold v. State*, 938 N.E.2d 837, 840 (Ind. Ct. App. 2010), *trans. denied*. As noted above, Officer Ball had reasonable suspicion to believe Sutton may be armed and dangerous. Sutton's potential possession of a firearm creates an officer safety issue, regardless of the number of officers on scene or the bystanders' level of cooperation. Therefore, this factor, too, weighs in favor of the State. *J.R.*, 89 N.E.3d at 412 (concluding "the extent of law enforcement needs was great—Officer Snow needed to be able to conduct his investigation in safety.").

[33] All three *Litchfield* factors weigh in favor of the State and thus the search of Sutton's person for weapons was reasonable under Article 1, Section 11 of the Indiana Constitution.

## C. Abuse of Discretion

[34] Under the totality of the circumstances, Officer Ball possessed reasonable suspicion that Sutton may be armed and dangerous. Therefore, the Fourth Amendment permitted Officer Ball to conduct a *Terry* frisk of Sutton's person and that search was reasonable under Article 1, Section 11. During the search,

Officer Ball detected what was "immediately" apparent to him to be illegal narcotics. Tr., Vol. 3 at 39. Officers may seize contraband detected through the officer's sense of touch during the lawful execution of a *Terry* frisk. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Accordingly, the trial court did not abuse its discretion by admitting the evidence at trial.[2]

# II. Jury Instructions

[35] Next, Sutton argues the trial court committed fundamental error when instructing the jury. Specifically, Sutton contends that the jury instructions relating to the two dealing charges[3] failed to inform the jury of an element of the crimes—that there must be evidence of his intent to deal *in addition* to the weight of the drugs. In turn, the State argues the language does not amount to an element of the crime and that even if it does, such error does not rise to the level of fundamental error. For the reasons set forth below, we conclude that any error was harmless.

## A. Standard of Review

[36] The manner of instructing a jury is left to the sound discretion of the trial court. *Patton v. State*, 837 N.E.2d 576, 579 (Ind. Ct. App. 2005). When reviewing the jury instructions, we consider them as a whole and in reference to each other.

---

[2] Because we conclude Officer Ball possessed reasonable suspicion that Sutton may be armed and dangerous, we need not address the State's alternative argument regarding a search incident to arrest.

[3] Count I, dealing in a narcotic drug, and Count III, dealing in cocaine, both Level 2 felonies.

*Id.* Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Id.* A defendant who fails to object to a jury instruction at trial waives any challenge to that instruction on appeal, unless giving the instruction was fundamental error. *Wright v. State*, 730 N.E.2d 713, 716 (Ind. 2000).

[37] Sutton admits that he failed to object to the jury instructions at trial. Br. of Appellant at 31. To avoid waiver, Sutton bears the burden of establishing that the instructional errors constitute fundamental error.

> Fundamental error is error that represents a blatant violation of basic principles rendering the trial unfair to the defendant, thereby depriving the defendant of fundamental due process. The error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. In determining whether a claimed error denies the defendant a fair trial, we consider whether the resulting harm or potential for harm is substantial. The element of harm is not shown by the fact that a defendant was ultimately convicted. Rather, it depends upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled.

*Evans v. State*, 81 N.E.3d 634, 637 (Ind. Ct. App. 2017) (citations omitted).

[38] Before proceeding, we note that Sutton's claim is set forth under the Sixth Amendment to the United States Constitution, and he does not make a separate argument relating to the protections of Article 1, Section 13. In *Davenport v. State*, we explained that:

> Absent a clear invocation of a violation of rights under the Indiana Constitution and cogent supporting argument, we will assume that defendant raises only a claim under the United States Constitution and will analyze that claim as we would a federal constitutional claim.

734 N.E.2d 622, 624 n.2 (Ind. Ct. App. 2000) (citing *Smith v. State,* 689 N.E.2d 1238, 1240 n. 3 (Ind. 1997)), *trans. denied.* Because Sutton fails to separately invoke or provide relevant authority relating to Article 1, Section 13, we review Sutton's claim only under the federal constitution.

## B. Final Jury Instructions

[39] Sutton was charged with Count I, dealing in a narcotic drug, and Count III, dealing in cocaine, both under Indiana Code section 35-48-4-1(a)(2) (2014). The version of the statute in effect on the date of the offense, April 16, 2015, states:

> (a)   A person who:
>
> * * *
>
> (2) possesses, with intent to:
>
>    . . .
>
>    (C) deliver;
>
>     . . .
>
>    cocaine or a narcotic drug, pure or adulterated, classified in schedule I or II;
>
> commits dealing in cocaine or a narcotic drug, a Level 5 felony, except as provided in subsections (b) through (e).
>
> (b)   A person may be convicted of an offense under subsection (a)(2) only if there is evidence in addition to the weight of

the drug that the person intended to manufacture, finance the manufacture of, deliver, or finance the delivery of the drug.

\* \* \*

(e)     The offense is a Level 2 felony if:

(1) the amount of the drug involved is at least ten (10) grams[.]

[40]     At issue here is the requirement in subsection (b) that a person may "be convicted of an offense . . . *only* if there is evidence *in addition* to the weight of the drug." *Id.* (emphasis added). This requirement did not appear in pre-2014 versions of Indiana Code section 35-48-4-1 and went into effect on July 1, 2014.[4]

[41]     The trial court delivered the following jury instructions:

FINAL INSTRUCTION NO. 2

COUNT I

The Defendant is charged in Count I with the offense of Dealing in A Narcotic Drug, which is defined by statute as follows:

A person who knowingly or intentionally possesses with the intent to deliver heroin, pure or adulterated, a narcotic drug

---

[4] Indiana Code section 35-48-4-1 was amended again in 2016. Subsection (b) now provides:

(b) A person may be convicted of an offense under subsection (a)(2) only if:

(1) there is evidence in addition to the weight of the drug that the person intended to manufacture, finance the manufacture of, deliver, or finance the delivery of the drug; or

(2) the amount of the drug involved is at least twenty-eight (28) grams.

classified in Schedule I of the Indiana Uniform Controlled Substances Act, in an amount of at least 10 grams commits Dealing in a Narcotic Drug.

To convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:

1. On or about April 16, 2015,
2. The Defendant, Otto Sutton,
3. Knowingly or intentionally
4. Possessed
5. With the intent to deliver
6. Heroin, pure or adulterated,
7. Said heroin having a weight of at least 10 grams.

If the State fails to prove each of these elements beyond a reasonable doubt, you must find the Defendant, Otto Sutton, not guilty of Dealing in a Narcotic Drug, as charged in Count I.

\* \* \*

FINAL INSTRUCTION NO. 4

COUNT III

The Defendant is charged in Count III with the offense of Dealing in Cocaine, which is defined by statute as follows:

A person who knowingly or intentionally possesses with the intent to deliver cocaine, pure or adulterated, in an amount of at least 10 grams commits Dealing in Cocaine.

To convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:

1. On or about April 16, 2015,
2. The Defendant, Otto Sutton,
3. Knowingly or intentionally
4. Possessed
5. With the intent to deliver
6. Cocaine, pure or adulterated,
7. Said cocaine having a weight of at least 10 grams.

If the State fails to prove each of these elements beyond a reasonable doubt, you must find the Defendant, Otto Sutton, not guilty of Dealing in Cocaine, as charged in Count III.

Appellant's App., Vol. III at 134, 136.

[42] Sutton argues the omitted language constitutes an element of the offenses and that its omission rises to the level of fundamental error. In turn, the State argues that the language does not constitute an element, but merely a "minimal guideline for evidentiary significance" or an "advisement," and that even if it does amount to an element, the error is not fundamental. Br. of Appellee at 38.

[43] "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court held that where a jury was not instructed on an element of an offense, and thus there was no jury finding on that element, the error may be harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty," despite the lack of an actual jury finding on that element. *Id*. at 18. In so holding, however, the court cautioned that "safeguarding the jury guarantee will often

require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." *Id.* at 19.

[44] The omission or misstatement of an element is erroneous, but it will not rise to the level of fundamental error "where the issue was not a central issue at trial," *Winkleman v. State*, 22 N.E.3d 844, 850 (Ind. Ct. App. 2014), *trans. denied*, or if the other instructions, viewed as a whole, sufficiently inform the jury of the State's burden of proof, *Ramsey v. State*, 723 N.E.2d 869, 873 (Ind. 2000). Here, despite Sutton's urging, we need not decide whether the language of Indiana Code section 35-48-4-1 (b) (2014) constitutes an element of the offenses, for even if it does, we conclude its omission did not render a fair trial impossible. *Evans*, 81 N.E.3d at 637.

[45] Sutton stipulated to the amounts of each substance found on his person and that the substances were, in fact, cocaine and heroin. Thus, as the State noted in closing argument, "[T]he only question you're to determine is what was [Sutton's] intent." Tr., Vol. 3 at 172. Although Sutton's intent was clearly the central issue for trial, whether there was "evidence in addition to the weight of the drug[s]," Indiana Code section 35-48-4-1 (b) (2014), was *not*.

[46] Here, the State presented numerous pieces of evidence in addition to the weight of the drugs. Detective Ingram testified that Sutton did not display the distinguishing characteristics of a drug addict and that it would be highly

unusual, if not impossible, for an individual to be addicted to cocaine and heroin at the same time. Sutton also possessed the drugs in accordance with their profitability, a large amount of cash in accordance with the denominations prevalent in drug transactions, and three cell phones, two of which were cheap "burner phone[s]" common amongst drug dealers. Tr., Vol. 3 at 124. To the extent Sutton now argues that he "strongly contested these non-weight factors" and emphasizes the low weight of the State's evidence, we find such arguments unconvincing. Indiana Code section 35-48-4-1(b) (2014) provides simply that a person may be convicted of such offense only if there is evidence "in addition to the weight of the drug." Under a plain reading of the statute, we see no reason the evidence need be overwhelming. *See State v. Thakar*, 82 N.E.3d 257, 260 (Ind. 2017) (noting that where a statute is unambiguous, we "begin—and end—our analysis" with the plain text).

[47] Moreover, when viewed as whole, the jury instructions correctly informed the jury that the State was required to prove beyond a reasonable doubt that Sutton knowingly or intentionally possessed the drugs *with the intent to deliver*. Both instructions provide:

> 1. On or about April 16, 2015,
> 2. The Defendant, Otto Sutton,
> 3. Knowingly or intentionally
> 4. Possessed
> 5. *With the intent to deliver*
> 6. [Heroin / Cocaine], pure or adulterated,
> 7. Said [heroin / cocaine] having a weight of at least 10 grams.

Appellant's App., Vol. III at 134, 136 (emphasis added). Simply finding the weight of the drugs exceeded ten grams—which was stipulated by Sutton— would not have satisfied the tendered final jury instructions. Clearly then, *with the intent to deliver* necessitated evidence in addition to the weight of the drugs. Therefore, in context and viewed as whole, the jury instructions sufficiently informed the jury of the State's burden of proof. *Ramsey*, 723 N.E.2d at 873.

[48] We conclude that although the jury instructions should have included an express statement to the jury that evidence of Sutton's guilt was required *in addition* to the weight of the drugs, because it is clear beyond a reasonable doubt that a rational jury would have found Sutton guilty regardless, any such error was harmless. *Neder*, 527 U.S. at 19.[5]

# III. Habitual Offender Finding

[49] Next, Sutton argues there was insufficient evidence that he was an habitual offender.

[50] When reviewing a challenge to the sufficiency of the evidence, we look only to the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Smith v. State*, 21 N.E.3d 121, 124 (Ind. Ct. App.

---

[5] Sutton also argues that because the omitted language constituted a fact that increases the penalty for the crime, such fact must have been submitted to the jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). However, Sutton raised this argument for the first time in oral argument and "issues are waived when raised for the first time at oral argument." *Harris v. State*, 76 N.E.3d 137, 140 (Ind. 2017).

2014). We neither reweigh the evidence nor judge the credibility of the witnesses. *Walls v. State*, 993 N.E.2d 262, 266 (Ind. Ct. App. 2013), *trans. denied*.

[51] The habitual offender statute provides, in relevant part:

> (b) A person convicted of murder or of a Level 1 through Level 4 felony is a habitual offender if the state proves beyond a reasonable doubt that:
>
> > (1) the person has been convicted of two (2) prior unrelated felonies; and
>
> > (2) at least one (1) of the prior unrelated felonies is not a Level 6 felony or a Class D felony.

Ind. Code § 35-50-2-8.

[52] For the State to prove beyond a reasonable doubt that a defendant is an habitual offender:

> Certified copies of judgments or commitments containing a defendant's name or a similar name may be introduced to prove the commission of prior felonies. While there must be supporting evidence to identify the defendant as the person named in the documents, the evidence may be circumstantial. If the evidence yields logical and reasonable inferences from which the finder of fact may determine beyond a reasonable doubt that it was a defendant who was convicted of the prior felony, then a sufficient connection has been shown.

*Hernandez v. State*, 716 N.E.2d 948, 953 (Ind. 1999) (citations omitted).

[53]    During the first phase of Sutton's trial, the State established that Sutton was a 5'9" black male with brown eyes and a birth date of August 10, 1984. State's Exhibit 2, Exhibits at 20. Then, during the second phase of the trial, the State produced certified copies of prior judgments for (1) dealing cocaine or a narcotic drug, a Class B felony, under Cause Number 49G20-0911-FA-097171 (Cause # 171) in 2011, State's Exhibit 8, Exhibits at 50; and, (2) resisting law enforcement, a Class D felony, under Cause Number 49F09-0801-FD-013743 (Cause # 743) in 2008. State's Exhibit 11, Exhibits at 61. The State produced the following evidence:

[Cause # 171]

- Charging information with a matching cause number, the name "Otto Sutton a/k/a Trevis Stokes," and the date of birth of "8/10/84" (State's Exhibit 6)

- Plea agreement with a matching cause number and the name "Otto Sutton" (State's Exhibit 7)

- Abstract of Judgment with a matching cause number and the name "Otto Sutton" (State's Exhibit 8)

[Cause # 743]

- Charging information with a matching cause number, the name "Otto Sutton," and the date of birth "08/10/1984" (State's Exhibit 9)

- A plea agreement with the cause number "08013743," the name "Otto Sutton," and a date of June 25, 2008 (State's Exhibit 10)

- Abstract of Judgment with a matching cause number, the name "Otto Sutton," and a sentencing date of July 2, 2008 (State's Exhibit 11)

Br. of Appellant at 39. Additionally, the charging information in Cause # 743 provided the defendant was a black male. State's Exhibit 9, Exhibits at 53. Sutton did not object to the admission of the State's evidence. Still, on appeal, Sutton argues the State failed to prove that he was the same Otto Sutton identified in those documents.

[54] Sutton first alleges there are several "problems" with the State's evidence: (1) the only document with a date of birth in Cause #171 also has a "alternate name"; and (2) the plea agreement in Cause #743 has a different cause number. *Id.* These "problems," however, are insignificant. *Id.* The "alternate name" simply lists an alias, or an "a/k/a," along with "Otto Sutton," and the alleged incorrect cause number reflects the correct cause number if the letters of the cause number are omitted as the cause number is handwritten on the document.[6] State's Exhibit 10, Exhibits at 59.

---

[6] The cause number at issue is "49F090801FD013743" while the cause number on the plea agreement is "08013743" and was entered in Marion Superior Court, Criminal Division 9, the same court identified as the sentencing court in the matching abstract of judgment. State's Exhibit 10-11, Exhibits at 59, 61.

[55] Next, Sutton argues the State has at best shown that the person or persons with the prior convictions have the same name and date of birth, citing a recent decision by another panel of this court in *Payne v. State* for the proposition that "a matching name and birth date, absent other identifying evidence, are not sufficient to prove identity." 96 N.E.3d 606, 612 (Ind. Ct. App. 2018), *trans. denied*. In *Payne*, the State produced a certified record of a prior robbery conviction with the same name and date of birth as the defendant and argued that it had produced "additional evidence of Payne's identity" in the form of matching signatures on the plea agreement in the robbery and the signed advisement of rights from the present case. *Id*. at 612. Because the signature from the plea agreement had not been authenticated as belonging to Payne, we held that such evidence was insufficient.

[56] Here, however, there was additional supporting evidence to identify the person named in the documents as the defendant in the present case. *Id.* at 611. Additional proof of identify may consist of circumstantial evidence, and a sufficient connection between the documents and the defendant is made if the evidence yields logical and reasonable inferences from which the trier of fact may determine it was indeed the defendant who was convicted of the alleged felonies. *Baxter v. State*, 522 N.E.2d 362, 365 (Ind. 1988). In addition to evidence of Sutton's unique name and identification as a black male with the date of birth of August 10, 1984, there was also testimony that Officer Ball recognized Sutton from, among other things, an arrest for resisting law enforcement. Tr., Vol. 2 at 66. Where the habitual offender phase of these

proceedings was conducted as a bench trial and the trial court previously heard such testimony, we conclude there was sufficient evidence to support Sutton's adjudication as an habitual offender.

# IV. Merging of Convictions

[57] Finally, Sutton argues that the trial court erred by merging Count II into Count I, and Count IV into Count III, without vacating the formal judgments of conviction because this constitutes double jeopardy. We agree.

[58] We review claims of double jeopardy violations de novo because it presents a question of law. *Cleary v. State*, 23 N.E.3d 664, 668 (Ind. 2015).

[59] Because Count II, possession of a narcotic drug, includes all of the statutory elements and evidence required to prove Count I, dealing in a narcotic drug, and Count IV, possession of cocaine, includes all of the statutory elements required to prove Count III, dealing in cocaine, entry of convictions for all four counts violates the double jeopardy clauses of both the United States and Indiana Constitutions. *Richardson v. State*, 717 N.E.2d 32, 50 (Ind. 1999). Recognizing the double jeopardy implications, the trial court merged Count II into Count I, and Count IV into Count III.

[60] In *Kovats v. State*, we held,

> If a trial court does not formally enter a judgment of conviction
> on a jury verdict of guilty, then there is no requirement that the
> trial court vacate the "conviction," and merger is appropriate.
> However, if the trial court does enter judgment of conviction on a

jury's guilty verdict, then simply merging the offenses is insufficient and vacation of the offense is required.

982 N.E.2d 409, 414-15 (Ind. Ct. App. 2013) (citations omitted).

[61] Here, the trial court orally entered judgment of conviction on Counts I, II, III, and IV, immediately after the jury returned its verdict. Tr., Vol. 3 at 199. The Chronological Case Summary ("CCS") shows judgment was formally entered for Counts I, II, III, and IV after the jury verdict on September 19, 2017. Appellant's App., Vol. II at 20-21. Then, at the sentencing hearing on November 27, 2017, the trial court orally "merged" Count II with Count I, and Count IV with Count III. Tr., Vol. 3 at 215. The CCS entry for the sentencing hearing, sentencing order, and abstract of judgment state "Conviction Merged" for Counts II and IV. Appellant's App., Vol. II at 22, 24, 27.

[62] Sutton argues that *Kovats* requires a remand for the trial court to vacate his convictions for Count II and Count IV, and the State concedes this case "should be remanded for the limited purpose of issuing a corrected abstract of judgment." Br. of Appellee at 45. We agree, and we remand so that the trial court may formally vacate Sutton's convictions on Count II and Count IV and correct the abstract of judgment accordingly.

# Conclusion

[63] For the reasons discussed at length above, we conclude the pat-down search was a reasonable *Terry* frisk, the jury instructions did not rise to the level of

fundamental error, there was sufficient evidence that Sutton was an habitual offender, and the trial court erred when it merged the counts of possession with the counts of dealing without vacating the formal judgments of conviction. We therefore affirm in part, reverse in part, and remand.

[64]     Affirmed in part, reversed in part, and remanded.


Pyle, J., and Altice, J., concur.